AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT
12/15/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPTUY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
12/15/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ IV _____ DEPUTY

United States Of America,

    Plaintiff,

    v.

FERNANDO CARMONA,

    Defendant.

Case No.   2:25-MJ-07801-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 28, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(o)(1): | Possession of Machinegun |

This criminal complaint is based on these facts:

*Please see attached affidavit.*
    ☒ Continued on the attached sheet.

*/s/ Cullen Schmitz*
*Complainant's signature*

Cullen Schmitz, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   12/15/2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA(s): Kenneth R. Carbajal(x3172)/Clifford Mpare (x4962)

# Contents

I.  BACKGROUND OF AFFIANT..................................1

II.  CRIMINAL COMPLAINTS AND ARREST WARRANTS..............2

III. PERSONS AND PREMISES TO BE SEARCHED AND ITEMS TO BE
     SEIZED...............................................4

IV.  BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT.........12

V.   STATEMENT OF PROBABLE CAUSE.........................14

     A.   PUENTE-13 GANG.................................14

          1.   Background of the Puente-13 Gang..........14

          2.   The Mexican Mafia's Relationship with the
               Puente-13 Gang............................17

          3.   Purposes of the Puente-13 Gang............19

          4.   The Means and Methods of the Puente-13 Gang
               ..........................................20

     B.   DECEMBER 18, 2022: ORNELAS AND LOPEZ PARTICIPATE
          IN A SHOOTING AT A KNOWN BLACKWOOD CLIQUE
          RESIDENCE......................................21

          1.   Summary of Evidence of the Puente-13 Street
               Gang's Involvement........................21

          2.   Description of the Shooting...............21

     C.   MARCH 15, 2023: V. SANCHEZ AND CASTRO SELL 2.47
          GRAMS OF COCAINE TO ATF CONFIDENTIAL INFORMANT..26

     D.   MARCH 22, 2023: V. SANCHEZ AND FAUSTO SELL 100
          FENTANYL PILLS, 5.22 GRAMS OF METHAMPHETAMINE,
          AND ONE FIREARM TO ATF CONFIDENTIAL INFORMANT...27

     E.   APRIL 5, 2023: V. SANCHEZ SELLS 1,000 FENTANYL
          PILLS, 441 GRAMS OF METHAMPHETAMINE, AND ONE
          FIREARM TO ATF CONFIDENTIAL INFORMANT..........30

     F.   APRIL 5, 2023: V. SANCHEZ SELLS 113 GRAMS OF
          METHAMPHETAMINE AND ONE FIREARM TO ATF
          CONFIDENTIAL INFORMANT.........................31

     G.   JUNE 1, 2023: FAUSTO AND V. SANCHEZ SELL 500
          PILLS TO ATF CONFIDENTIAL INFORMANT............33

     H.   JUNE 7, 2023: CASTRO SELLS ONE FIREARM AND AN
          OUNCE OF COCAINE TO ATF CONFIDENTIAL INFORMANT..34

I.      JUNE 13, 2023: CASTRO, L. SANCHEZ, PONCE, AND
        MEJIA SELL TWO FIREARMS AND ONE SHORT-BARRELED
        RIFLE TO AN ATF CONFIDENTIAL INFORMANT; CASTRO
        AND L. SANCHEZ SELL ONE FIREARM TO AN ATF
        CONFIDENTIAL INFORMANT; CASTRO SELLS COCAINE TO
        AN ATF CONFIDENTIAL INFORMANT....................35

J.      JUNE 28, 2023: CASTRO AND GORDIAN-PADILLA SELL
        ONE FIREARM TO AN ATF CONFIDENTIAL INFORMANT;
        CASTRO AND DOMINGUEZ SELL ONE FIREARM TO AN ATF
        CONFIDENTIAL INFORMANT; CASTRO AND KANG SELL
        COCAINE TO AN ATF CONFIDENTIAL INFORMANT; CASTRO
        AND CARMONA SELL ONE MACHINEGUN AND RIFLE TO AN
        ATF CONFIDENTIAL INFORMANT.......................38

K.      JULY 20-21, 2023: LOPEZ, COVARRUBIAS, CASTILLO,
        AND JOHNSON KIDNAP VICTIMS A.A. AND A.C.........42

        1.     Summary of Evidence of the Puente-13 Street
               Gang's Involvement.........................42

        2.     Description of the Kidnapping.............42

L.      AUGUST 2, 2023: V. SANCHEZ SELLS ONE SHORT-
        BARRELED RIFLE TO ATF CONFIDENTIAL INFORMANT; V.
        SANCHEZ AND FAUSTO SELL TWO FIREARMS TO ATF
        CONFIDENTIAL INFORMANT...........................50

M.      AUGUST 8, 2023: CASTRO SELLS ONE FIREARM TO ATF
        CONFIDENTIAL INFORMANT; CASTRO AND CARMONA SELL
        FOUR FIREARMS TO ATF CONFIDENTIAL INFORMANT.....51

N.      AUGUST 10, 2023: CASTRO AND ORNELAS SELL ONE
        FIREARM TO ATF CONFIDENTIAL INFORMANT...........53

O.      AUGUST 23, 2023: FAUSTO SELLS ONE FIREARM AND
        METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT...54

P.      SEPTEMBER 6, 2023: CASTRO AND DOMINGUEZ SELL TWO
        FIREARMS TO ATF CONFIDENTIAL INFORMANTS; CASTRO
        SELL COCAINE TO ATF CONFIDENTIAL INFORMANTS;
        CASTRO AND GORDIAN-PADILLA SELL TWO FIREARMS TO
        ATF CONFIDENTIAL INFORMANTS......................56

Q.      SEPTEMBER 7, 2023: SEARCH WARRANT OF CARMONA
        RESIDENCE........................................58

R.      OCTOBER 12, 2023: V. SANCHEZ SELLS ONE POUND OF
        METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT...58

S.      NOVEMBER 15, 2023: V. SANCHEZ SELLS ONE FIREARM
        TO ATF CONFIDENTIAL INFORMANT....................59

T.      NOVEMBER 20, 2023: V. SANCHEZ, CASTRO, DOMINGUEZ,

AND F. RODRIGUEZ SELL TWO FIREARMS TO ATF
CONFIDENTIAL INFORMANT.........................61

U.   DECEMBER 6, 2023: CASTRO SELL FIVE FIREARMS TO
ATF CONFIDENTIAL INFORMANT; CASTRO AND DOMINGUEZ
SELL ONE POUND OF METHAMPHETAMINE TO ATF
CONFIDENTIAL INFORMANT.........................62

V.   JANUARY 11, 2024: V. SANCHEZ, L. SANCHEZ, AND F.
RODRIGUEZ SELL TWO FIREARMS AND ONE POUND OF
METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT...65

W.   FEBRUARY 13, 2024: V. SANCHEZ AND L. SANCHEZ SELL
TWO FIREARMS AND TWO POUNDS OF METHAMPHETAMINE TO
ATF CONFIDENTIAL INFORMANT......................67

X.   FEBRUARY 13, 2024: GORDIAN-PADILLA SELLS ONE
FIREARM TO ATF CONFIDENTIAL INFORMANT...........70

Y.   FEBRUARY 28, 2024: V. SANCHEZ AND L. SANCHEZ SELL
TWO FIREARMS, INCLUDING ONE SHORT-BARRELED RIFLE
AND ONE POUND OF METHAMPHETAMINE TO ATF
CONFIDENTIAL INFORMANT.........................71

Z.   FEBRUARY 28, 2024: GORDIAN-PADILLA SELLS ONE
FIREARM ATF CONFIDENTIAL INFORMANT.............73

AA.  APRIL 10, 2024: V. SANCHEZ AND L. SANCHEZ SELL
TWO POUNDS OF METHAMPHETAMINE TO ATF CONFIDENTIAL
INFORMANT......................................74

BB.  SEPTEMBER 16, 2024: V. SANCHEZ AND MOTAMEDI SELL
1,000 CARFENTANIL PILLS TO AN ATF CONFIDENTIAL
INFORMANT AND ATF UNDERCOVER AGENT..............75

CC.  SEPTEMBER 18, 2024: LAW ENFORCEMENT SERVE SEARCH
WARRANT AT J. AND E. RODRIGUEZ APARTMENT AND
RECOVER DRUGS AND FIREARMS. LOPEZ IS IDENTIFIED
AS SUPPLYING J. AND E. RODRIGUEZ WITH M30 PILLS.77

DD.  NOVEMBER 4, 2024: V. SANCHEZ AND MOTAMEDI SELL
10,000 M30 PILLS CONTAINING NO FENTANYL TO AN ATF
CONFIDENTIAL INFORMANT. V. SANCHEZ SELLS A
FIREARM TO AN ATF CONFIDENTIAL INFORMANT.......82

EE.  NOVEMBER 5, 2024: LAW ENFORCEMENT SERVES A SEARCH
WARRANT AT A RESIDENCE USED TO STORE GUNS AND
DRUGS BY MEMBERS OF PUENTE-13..................83

FF.  DECEMBER 10, 2024: V. SANCHEZ SELLS 500 FENTANYL
PILLS TO ATF CONFIDENTIAL INFORMANT.............86

GG.  JANUARY 2, 2025: V. SANCHEZ AND FAUSTO SELL 1,000
FENTANYL PILLS TO AN ATF CONFIDENTIAL INFORMANT.87

HH.   MARCH 19, 2025: LAW ENFORCEMENT EXECUTES A SEARCH
      WARRANT AT ORNELAS' RESIDENCE AND RECOVERS ONE
      FIREARM, COCAINE, AND ECSTASY....................89

II.   APRIL 17, 2025: LOPEZ SOLD 1,000 FENTANYL PILLS
      TO AN ATF CONFIDENTIAL INFORMANT.................91

JJ.   MAY 2, 2025: ESTRADA-FROST SHOOTS AT R.C........93

      1.   Summary of Evidence of the Puente-13 Street
           Gang's Involvement.........................93

      2.   Description of the May 2, 2025, Shooting...94

KK.   Felony Criminal Histories.......................99

LL.   Interstate Nexus of Firearms and Ammunition....100

MM.   Identification of the SUBJECT PREMISES and
      Continued Criminal Activity at the SUBJECT
      PREMISES and by Persons to Be Searched........100

      1.   V. SANCHEZ and L. SANCHEZ: SUBJECT PREMISES
           1.........................................101

      2.   FAUSTO: SUBJECT PREMISES 2...............102

      3.   LOPEZ: SUBJECT PREMISES 3................103

      4.   GORDIAN-PADILLA: SUBJECT PREMISES 4......107

      5.   CARMONA: SUBJECT PREMISES 5..............108

      6.   J. RODRIGUEZ and E. RODRIGUEZ: SUBJECT
           PREMISES 6...............................110

VI.   TRAINING AND EXPERIENCE ON DRUG TRAFFICKING OFFENSES
      112

VII.  TRAINING AND EXPERIENCE ON FIREARM OFFENSES........114

VIII.    TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES
      116

IX.   TRAINING AND EXPERIENCE ON KIDNAPPING AND OTHER
      VIOLENT OFFENSES..................................118

X.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES.........119

XI.   REQUEST FOR NIGHT SERVICE.........................123

XII.  CONCLUSION........................................123

## AFFIDAVIT

I, Cullen Schmitz, being duly sworn, declare and state as follows:

### I.  BACKGROUND OF AFFIANT

1.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since September 2021.  I am currently assigned to the Long Beach Field Office of the ATF Los Angeles Field Division, where I investigate violent crimes, alongside firearms and drugs trafficking, often perpetrated by gang members in the Los Angeles area.  I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.    Since September 2021, I have investigated gang-motivated violent crime and firearms and drug trafficking throughout the Los Angeles area.  In this capacity, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, Title-III wiretaps, pen register and trap and trace devices, Global Positioning System ("GPS") information, telephone toll analysis, undercover operations, search warrants, and electronic examinations of evidence.

3.    From October 2016 to September 2021, I was employed by the Los Angeles Police Department ("LAPD"), where I worked in the Major Crimes Division and Gang Enforcement Detail.  During

my tenure with LAPD, I investigated numerous gang-related crimes such as shootings, homicides, drug sales, robberies, burglaries, and other crimes intended to benefit gangs. I testified as a court-certified gang expert. Additionally, I attended multiple gang trainings in the recent trends for gangs in the Los Angeles area. I received my bachelor's degree in criminal justice from the Metropolitan State University of Denver in 2015.

4.   Based upon my training and experience with ATF and LAPD, as well as conversations I have had with other agents and law enforcement officers who have investigated complex gang investigations, testified as gang experts, interviewed hundreds of gang members, and investigated firearms and drug trafficking crimes, I am knowledgeable in the violence committed by and on behalf of the gangs, firearms and drug trafficking, fraud, and similar offenses that benefit gangs.

## II. CRIMINAL COMPLAINTS AND ARREST WARRANTS

5.   This affidavit is made in support of 13 criminal complaints and 20 arrest warrants against the following individuals:

a.   Victor SANCHEZ, also known as ("aka") "Pollo" and "Chicken," ("V. SANCHEZ") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (April 5, 2023);

b.   Isaiah CASTRO, aka "Boy," ("CASTRO") and Abel DOMINGUEZ ("DOMINGUEZ") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (December 6, 2023);

2

c.    Lucky SANCHEZ, aka "Debo," ("L. SANCHEZ") and Francisco RODRIGUEZ, aka "Franco," ("F. RODRIGUEZ") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (January 11, 2024);

d.    Esteban FAUSTO, aka "Fat Boy," ("FAUSTO") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (August 23, 2023);

e.    Adrian LOPEZ, aka "TappedIn" and "Monkey" ("LOPEZ"); Larry CASTILLO, aka "Lil Dee" ("CASTILLO"); Heather COVARRUBIAS, aka "Snowbella" and "Snow" ("COVARRUBIAS"); and Heather JOHNSON ("JOHNSON") for a single violation of 18 U.S.C. § 1201(c): Conspiracy to Commit Kidnapping (July 20-21, 2023);

f.    Dominic ORNELAS, aka "Dom," ("ORNELAS") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(C): Possession with Intent to Distribute Controlled Substance and 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime (March 19, 2025);

g.    Isaac ESTRADA-FROST, aka "Ghost," ("ESTRADA-FROST") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi): Possession with Intent to Distribute Fentanyl Analogue and 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime (November 5, 2024);

h.    Bryan GORDIAN-PADILLA, aka "Goon," ("GORDIAN-PADILLA") for a single violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm (February 28, 2024);

i.   Otan MOTAMEDI ("MOTAMEDI") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi): Distribution of Fentanyl Analogue (September 16, 2024);

j.   Fernando CARMONA ("CARMONA") for a single violation of 18 U.S.C. § 922(o)(1): Possession of Machinegun (June 28, 2023);

k.   John RODRIGUEZ ("J. RODRIGUEZ") and Erica RODRIGUEZ ("E. RODRIGUEZ") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi): Possession with Intent to Distribute Fentanyl and 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime (September 18, 2024);

l.   Soo KANG ("KANG") for a single violation of 21 U.S.C. § 841(a)(1), (b)(1)(C): Distribution of Cocaine (June 28, 2023); and

m.   Lorenzo MEJIA ("MEJIA") and Silbestre PONCE ("PONCE") for a single violation of 26 U.S.C. § 5861(d): Possession of Unregistered Short-Barreled Rifle (June 13, 2023).

III. **PERSONS AND PREMISES TO BE SEARCHED AND ITEMS TO BE SEIZED**

6.   This affidavit is made in support of applications for warrants to search the following persons and premises and to seize the following items (with each attachment incorporated herein by reference):

| Search Warrants | | |
|---|---|---|
| Attachment | Person/Premises | Items to Be Seized |
| A-1 | The person of V. SANCHEZ | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 922(g) (Being a prohibited person in possession of a firearm and ammunition), 922(o)(1)(Possession of a Machinegun), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License) ("V. SANCHEZ's Subject Offenses"), as described more fully in Attachment B-1. |

| Search Warrants | | |
|---|---|---|
| Attachment | Person/Premises | Items to Be Seized |
| A-2 | The person of CASTRO | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 922(o)(1)(Possession of a Machinegun), 924(c) (Possession of a firearm in furtherance of a drug trafficking crime and Possession of a firearm in furtherance of crimes of violence), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License) ("CASTRO's Subject Offenses"), as described more fully in Attachment B-2. |

| Search Warrants | | |
|---|---|---|
| **Attachment** | **Person/Premises** | **Items to Be Seized** |
| A-3 | The person of L. SANCHEZ | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 922(o)(1)(Possession of a Machinegun), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License); and 18 U.S.C. § 1959 (Violent crimes in aid of racketeering activity) ("L. SANCHEZ's Subject Offenses"), as described more fully in Attachment B-3. |
| A-4 | 3700 Mountain Avenue N, No. 1D, San Bernardino, California 92404 ("SUBJECT PREMISES 1") | L. SANCHEZ's Subject Offenses, as described more fully in Attachment B-3. |

| Search Warrants | | |
|---|---|---|
| Attachment | Person/Premises | Items to Be Seized |
| A-5 | 1001 North Hamilton Boulevard, Pomona, California 91768 ("SUBJECT PREMISES 2") | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 922(g) (Being a prohibited person in possession of a firearm and ammunition), 922(o)(1)(Possession of a Machinegun), 924(c) (Possession of a firearm in furtherance of a drug trafficking crime and Possession of a firearm in furtherance of crimes of violence), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License)("SUBJECT PREMISES 2's Subject Offenses"), as described more fully in Attachment B-4. |
| A-6 | The person of LOPEZ | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. § 1201(a)(1),(c)(Conspiracy to Commit Kidnapping and Kidnapping); and 18 U.S.C. § 1959 (Violent crimes in aid of racketeering activity) ("LOPEZ's Subject Offenses"), as described more fully in Attachment B-5. |

8

| Search Warrants | | |
|---|---|---|
| **Attachment** | **Person/Premises** | **Items to Be Seized** |
| A-7 | 1125 Charlemont Avenue, La Puente, California 91745 ("SUBJECT PREMISES 3") | LOPEZ's Subject Offenses, as described more fully in Attachment B-5. |
| A-8 | The person of ORNELAS | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 924(c) (Possession of a firearm in furtherance of a drug trafficking crime and Possession of a firearm in furtherance of crimes of violence), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License), and 18 U.S.C. § 1959 (Violent crimes in aid of racketeering activity) ("ORNELAS's Subject Offenses"), as described more fully in Attachment B-6. |

| Search Warrants | | |
|---|---|---|
| Attachment | Person/Premises | Items to Be Seized |
| A-9 | The person of ESTRADA-FROST | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. § 924(c) (Possession of a firearm in furtherance of a drug trafficking crime and Possession of a firearm in furtherance of crimes of violence); and 18 U.S.C. § 1959 (Violent crimes in aid of racketeering activity) ("ESTRADA-FROST's Subject Offenses"), as described more fully in Attachment B-7. |
| A-10 | The person of GORDIAN-PADILLA | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 922(g) (Being a prohibited person in possession of a firearm and ammunition), 922(o)(1)(Possession of a Machinegun), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License) ("GORDIAN-PADILLA's Subject Offenses"), as described more fully in Attachment B-8. |

| Search Warrants | | |
|---|---|---|
| Attachment | Person/Premises | Items to Be Seized |
| A-11 | 4964 Maine Avenue, Apartment 4, Baldwin Park, California 91706 ("SUBJECT PREMISES 4") | GORDIAN-PADILLA's Subject Offenses, as described more fully in Attachment B-8. |
| A-12 | The person of MOTAMEDI | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses) ("MOTAMEDI's Subject Offenses"), as described more fully in Attachment B-9. |
| A-13 | The person of CARMONA | Evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 933 (Firearms trafficking), 922(a)(1)(A) (Unlicensed dealing in firearms), 922(o)(1)(Possession of a Machinegun), 371 (Conspiracy to Engage in the Business of Dealing in Firearms Without a License)("CARMONA's Subject Offenses"), as described more fully in Attachment B-10. |
| A-14 | 739 ½ South Sydney Drive, East Los Angeles, California 90022 ("SUBJECT PREMISES 5") | CARMONA's Subject Offenses, as described more fully in Attachment B-10. |

| Search Warrants | | |
|---|---|---|
| **Attachment** | **Person/Premises** | **Items to Be Seized** |
| A-15 | 1900 Argyle Ave, Apartment 2, San Bernardino, California 92404 ("SUBJECT PREMISES 6") | Evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846, 841(a)(1) (Distribution and possession with the intent to distribute controlled substances, and attempt and conspiracy to do so), 843(b) (Unlawful use of a communications facility to facilitate the above-listed drug offenses); 18 U.S.C. § 922(g) (Being a prohibited person in possession of a firearm and ammunition), 924(c) (Possession of a firearm in furtherance of a drug trafficking crime)("SUBJECT PREMISES 6's Subject Offenses"), as described more fully in Attachment B-11. |

## IV. BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

7.    I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources:

a.    My experience in investigating gangs, narcotics traffickers, and firearm traffickers;

b.    Oral and written reports and documents about this and other investigations which I have received and/or reviewed from members of local and federal law enforcement agencies;

c.    Discussions I have had concerning this investigation with experienced narcotics and gang;

d.    Physical surveillances conducted by ATF, the Los Angeles County Sheriff's Department ("LASD"), the Covina Police Department ("CPD"), the Baldwin Park Police Department,

California Highway Patrol ("CHP"), and other local law enforcement agencies, the results of which have been reported to me either directly or indirectly;

e.    Telephone toll records, pen register information, and telephone subscriber information;

f.    Statements of cooperating sources of information;

g.    My review of recorded conversations, including those obtained from a Title-III wiretap and from recording devices affixed to confidential informants;

h.    California driver's license information derived from records from the California Department of Motor Vehicles; and

i.    Criminal history information derived from reliable sources of information, including law enforcement databases.

8.    This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all amounts or sums are approximate, and all dates and times are on or about those indicated. Additionally, except as otherwise noted, when the contents of documents or statements of others are reported herein, they are reported in substance and part.  In addition, unless otherwise specifically noted, whenever I assert that a statement was made, the information was provided by another law enforcement officer or a source of information (who may have had either direct or

13

hearsay knowledge of the statement) to whom I have spoken or whose report I have reviewed. Likewise, information resulting from surveillance, unless otherwise specifically indicated, does not necessarily set forth my own observations but rather has been provided directly or indirectly by other law enforcement officers who conducted such surveillance.

## V. STATEMENT OF PROBABLE CAUSE

9.   In early 2023, ATF, LASD, CPD, and other agencies launched an investigation into the Puente-13 street gang.  The investigation covered shootings, kidnapping, distribution of controlled substances, and firearm related offenses committed by members and associates of Puente-13, including V. SANCHEZ, CASTRO, L. SANCHEZ, FAUSTO, LOPEZ, ORNELAS, ESTRADA-FROST, GORDIAN-PADILLA, DOMINGUEZ, CASTILLO, COVARRUBIAS, JOHNSON, MOTAMEDI, CARMONA, F. RODRIGUEZ, J. RODRIGUEZ, E. RODRIGUEZ, KANG, MEJIA, and PONCE.

### A.   PUENTE-13 GANG

10.   Based on my conversations with law enforcement officers, a Puente-13 gang expert, and my own participation in this investigation, at times relevant to the conduct described in this affidavit:

#### 1.   Background of the Puente-13 Gang

11.   The Puente-13 gang was a multi-generational Hispanic street gang that was founded in the early 1950s in La Puente, California, and operated in Los Angeles County and elsewhere. At the time of its conception, it was known as the "Bridgetown Gentlemen" or "Old Town Puente" and was comprised of Hispanic

14

males who engaged in narcotics distribution and other street crimes, and members viewed themselves as La Puente's guardians against outside gangs.  Later, the gang became known simply as "Puente" or "Puente-13."  Over the years, it dramatically expanded its membership to approximately 600 individuals and expanded its territory into the neighboring Southern California unincorporated community of Hacienda Heights and cities of Walnut, Industry, Pomona, and West Covina.  There were at least 14 subsets, or "cliques," of the Puente-13 gang modernly. Cliques were founded by members living in a particular geographical area and named accordingly.  For example, Happy Homes was founded by residents of Hacienda Heights; cliques such as Ballista Street, Blackwood Street, Northam Street, and Dial Avenue were founded by members residing on those respective streets in La Puente.

12.  The Puente-13 gang was controlled by senior members of the individual cliques in charge of admission into the gang.  A new initiate typically would be admitted to the Puente-13 gang only after the approval of senior leaders and after submitting to a violent beating at the hands of other members (commonly referred to as "getting jumped in").  Some individuals were allowed to bypass this initiation process and were granted admission into Puente-13 based upon a senior leader's authority or by earning significant drug sales commissions on behalf of the gang (commonly referred to as being "walked in").  Those individuals also claimed Puente-13 gang membership.

13.   Puente-13 gang members frequently identified each other through hand gestures designating "P" for Puente and/or various symbols of the members' respective cliques.  Members commonly wore clothing depicting these same symbols.  For example, members often wore baseball hats for the Philadelphia Phillies or Pittsburgh Pirates, whose team insignia included a "P," for Puente, or baseball hats for the Tampa Bay Rays, whose team insignia included a "TB," for Tinflanes-Ballista, an alliance between Puente-13's Tinflanes clique and Ballista Street clique.  Gang tattoos, monikers, slogans, and spray-painted graffiti on street signs and walls were also commonly used to identify Puente-13 gang members and territory controlled by the gang.

14.   The Puente-13 gang, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The Puente-13 gang constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

15.   The Puente-13 gang, through its members and associates, engaged in racketeering activity, as defined in Title 18, United States Code, Sections 1959(b)(1) and 1961(1), that is, acts involving murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, and 664; acts involving kidnapping, in violation of California Penal Code Sections 21a,

31, 182, 207, and 664; acts involving dealing in a controlled substance, in violation of California Health and Safety Code Sections 11351 and 11352; offenses relating to trafficking of controlled substances in violation of Title 21, United States Code, Sections 841(a)(1) and 846; and offenses relating to trafficking in firearms, in violation of Title 18, United States Code, Section 933.

2.   The Mexican Mafia's Relationship with the Puente-13 Gang

16.   At least one Puente-13 gang member was also a validated member of the "Mexican Mafia," also known as "La Eme." He claimed as his territory, through the Mexican Mafia, a large portion of the Puente-13 gang territory and would collect taxes from those areas.  Mexican Mafia leaders, members, and associates communicated orders and authorizations to Puente-13 gang leaders, members, and associates, and received information about the activities of the Puente-13 gang.  Additionally, since senior members controlling the Puente-13 gang were also members or associates of the Mexican Mafia, the number 13 (signifying M, the thirteenth letter of the alphabet, for the Mexican Mafia) was commonly used to demonstrate that affiliation and loyalty to the Mexican Mafia.

17.   The Mexican Mafia was a prison gang that originated within the prison system in order to control and direct the activities of Southern California Hispanic street gangs.  "Made" members of the Mexican Mafia assumed authority for different regions in Southern California.  Typically, a "made" member was

a prison inmate who came from the ranks of a local Hispanic street gang, including the Puente-13 gang, and exercised control and direction over his territory both from within prison and from outside prison following his release.  The Mexican Mafia leaders issued directions and orders, including orders to kill rival gang members, which were referred to as "green-lights." Those orders were to be executed by California street gang members, including members of Puente-13, and were understood by Puente-13 gang members as opportunities to gain elevated status within the Puente-13 gang or potentially become a "made" member of the Mexican Mafia.

18.   The Mexican Mafia established rules to govern acts of violence committed by local Hispanic street gang members and associates, including those of Puente-13.  The Mexican Mafia required Puente-13 gang members and associates to adhere to protocols for the conduct of violent attacks, narcotics trafficking, and murders, including the issuance of "green-light" authorizations for murder and violence.  Failure to adhere to Mexican Mafia rules could lead to the issuance of a "green-light," directing an attack on the offending member, or the requirement that money be paid.  "Green-lights" were also frequently issued in retaliation for a perceived "disrespect" to a Mexican Mafia leader, to punish the unauthorized collection of "tax" payments in a neighborhood controlled by the Puente-13 gang, or to sanction individuals who traffic in narcotics without the gang's authorization or without paying the required tax to Puente-13 and the Mexican Mafia.

18

19.    Mexican Mafia and Puente-13 gang members and
associates regularly exploited prison visits, telephone calls,
policies concerning letter-communications with attorneys, and
prison monetary accounts in order to generate income from
narcotics trafficking and other crimes of the Puente-13 gang to
promote the Puente-13 gang and direct the operation of the
Puente-13 gang from within prison.  Mexican Mafia leaders also
required regular payments from Puente-13 members and associates
who were incarcerated.

20.    Mexican Mafia members collected "taxes" from the
members and associates of Southern California street gangs,
including Puente-13, in the form of a share of the proceeds from
the gangs' drug sales and violent conduct.  Puente-13 gang
leaders, in turn, extorted money from their subordinates, local
drug traffickers, and members of other gangs.  A portion of the
"taxes" collected by the Puente-13 gang leaders was then paid to
Mexican Mafia leaders who were incarcerated.

3.    Purposes of the Puente-13 Gang

21.    The purposes of the Puente-13 street gang included,
but were not limited to, the following:

a.    Enriching members and associates of the Puente-13
gang and Mexican Mafia through, among other things, the control
of and participation in the distribution of narcotics in the
territory controlled by the Puente-13 gang;

b.    Maintaining the control and authority of the
Puente-13 gang over the neighborhoods it controls, often through
threats and acts of violence;

19

c.    Preserving, protecting, and expanding the power of the Puente-13 gang through the use of intimidation, violence, threats of violence, assault, and murder;

d.    Promoting and enhancing the authority of the Puente-13 gang members and associates;

e.    Exposing and punishing Puente-13 gang members and associates, as well as those living within Puente-13 territory, who cooperate with law enforcement; and

f.    Providing protection from physical assaults and excessive extortion to Puente-13 gang members and associates when those individuals enter the prison system.

4.    <u>The Means and Methods of the Puente-13 Gang</u>

22.    The means and methods by which the members and associates of the Puente-13 gang conducted and participated in the conduct of the affairs of the Puente-13 gang included, but were not limited to, the following:

a.    Members and associates of the Puente-13 gang engaged in the trafficking of controlled substances and firearms as a means to generate income;

b.    Members and associates of the Puente-13 gang promoted a climate of fear through acts of violence and threats to commit acts of violence; and

c.    Members and associates of the Puente-13 gang committed, attempted to commit, conspired to commit, and threatened to commit acts of violence, including assault and murder, to preserve, protect, and expand the Puente-13 gang's operations.

20

**B.    DECEMBER 18, 2022: ORNELAS AND LOPEZ PARTICIPATE IN A
SHOOTING AT A KNOWN BLACKWOOD CLIQUE RESIDENCE**

1.    Summary of Evidence of the Puente-13 Street
Gang's Involvement

23.    As set forth below, there is probable cause to believe
that ORNELAS and another subject shot at a Blackwood clique
residence, which had several people congregating outside, and
LOPEZ drove ORNELAS to and from the shooting.  The evidence
supporting this determination includes, but is not limited to:
(1) social media posts between ORNELAS and other Ballista clique
members taunting members of Blackwood, (2) directions to the
address of the shooting saved in ORNELAS's cellphone, (3) a
picture of a handgun, which matched the handgun captured by
surveillance footage on the night of the shooting, and
ammunition saved in ORNELAS's cellphone the day before the
shooting, and (4) text message conversations between ORNELAS and
LOPEZ the following day seemingly discussing having participated
in the shooting.

2.    Description of the Shooting

24.    Based on my review of police reports, surveillance
footage, social media accounts, and recovered digital devices,
and from speaking with law enforcement familiar with the
investigation, I am aware of the following:

a.    The Ballista clique and the Blackwood clique of
Puente-13 have a long-standing feud with one another.  The feud
has led to violence between the two factions, including
shootings and homicides.  As part of this feud, Ballista clique
members ORNELAS and LOPEZ, and others, participated in a

21

shooting targeting Blackwood clique members congregating outside of a known Blackwood location on East Hurst Street in Covina, California (the "Blackwood Residence"). Surveillance footage shows two men firing numerous rounds at a large gathering of individuals across the street from them. CPD later recovered approximately 24 spent shell casings from the area surrounding the Blackwood Residence.

b.    On December 17, 2022, the day before the shooting, a fellow Ballista member sent ORNELAS a picture depicting Blackwood graffiti on a house's garage door. According to the photograph timestamps, hours later, ORNELAS took a picture of a Glock model 17 9mm handgun with an extended magazine loaded with ammunition sitting on a second black handgun. The ammunition type, caliber, and coloring matched the casings that were later recovered from the scene of the shooting. A short time after the photograph of the gun was taken, a photograph was captured of a black half-face mask in front of a shopping cart. This mask appeared to match the same mask worn by ORNELAS the following night during the shooting, as captured on surveillance footage.

c.    ORNELAS also posted Instagram Live stories prior to the shooting. These stories showed A.T., a known rival Blackwood member, with derogatory emojis placed near his face, done in an apparent effort to taunt A.T. ORNELAS continued to record and save Instagram Live videos of A.T. with comments visible from LOPEZ and other Ballista members taunting A.T.

d.    On December 18, 2022, the night of the shooting, ORNELAS captured a photograph of graffiti reading "V3 BWS," which, based on my training and experience, I know to be Blackwood gang graffiti.  Later in the evening, ORNELAS captured a screenshot of A.T. on Instagram Live, with Ballista members continuing to taunt him, with one comment reading, "Pull up… BlackwoodKilla," which, based on my training and experience, I believe was done in an effort to disrespect A.T.'s clique, Blackwood.

e.    ORNELAS also took a screenshot of driving directions to the intersection of E. Hurst Street and N. Barrance Avenue, Covina, California 91723 on ORNELAS's cellphone.  This intersection is approximately 400 feet away from the Blackwood Residence.  The screenshot was captured approximately one hour before the shooting occurred.

f.    Shortly before the shooting, security camera footage at a nearby house captured two men jump a rear retaining wall, walk alongside the house, and look across the street towards the Blackwood residence where numerous people were gathered.  From the camera footage, one of the two men had identifiable tattoos on both hands.  I observed an "8K" tattoo on the right hand, which is identical to an "8K" tattoo on ORNELAS's right hand.  Based on my participation in this investigation, I know that "8K" is the logo for 8Petown records, the record company that ORNELAS is signed to.

g.    As depicted in the surveillance footage, the male with the "8K" tattoo was wearing a black face mask, which

23

resembled the same black mask that ORNELAS saved in his phone
before the shooting, as discussed above.

        h.    Surveillance video showed the two men shoot in
the direction of the Blackwood Residence where several
individuals were standing.

        i.    I have included a still shot of the surveillance
video below:



        j.    Afterwards, ORNELAS and the other male ran away.
As they ran, ORNELAS tripped and lost his left shoe, before
jumping the retaining wall.

        k.    Law enforcement recovered a size 9 ½ shoe which
matched the same size and style of shoes found in ORNELAS's
bedroom closet during a subsequent search warrant on March 19,
2025.  An analysis of DNA collected from the shoe recovered from
the scene of the shooting matched ORNELAS's DNA.

24

l.    As CPD officers responded to the shooting scene, they saw a black Mercedes sedan bearing California license plate ending in -Y831 fleeing the area at a high rate of speed.  As CPD officers pulled the vehicle over, an officer observed and recognized LOPEZ as the driver of the vehicle.  As the officers approached the vehicle, LOPEZ drove off at a high rate of speed onto the freeway, exceeding 115 miles per hour and evading law enforcement.

m.    On December 30, 2022, approximately a week and a half after the shooting, West Covina Police Department located the black Mercedes sedan with the same license plate in the City of La Puente.  LOPEZ was seated in the driver seat of the Mercedes along with two other known Ballista clique gang members.

n.    On December 19, 2022, ORNELAS took a photograph of his left foot, which appeared to be swollen.  From the security footage from the night before, it was ORNELAS's left foot that he appeared to have rolled when he lost his shoe following the shooting.

o.    In text messages on December 18, 2022, which was the day after the shooting, ORNELAS texted LOPEZ, "did u find dat shit or no," to which LOPEZ responded he did.  ORNELAS asked if it was damaged, to which LOPEZ replied, "Nigga a Glock is the best fuck no it wasn't."  LOPEZ then reminded ORNELAS to delete his messages.

p.    Based on my training and experience, my knowledge of this investigation, including that a Glock firearm was used

in the shooting as discussed above, and my review of the conversation between ORNELAS and LOPEZ, I believe during the pursuit with CPD officers, LOPEZ discarded a Glock firearm, which he later went back and recovered.

**C.    MARCH 15, 2023: V. SANCHEZ AND CASTRO SELL 2.47 GRAMS OF COCAINE TO ATF CONFIDENTIAL INFORMANT[1]**

25.    Based on my review of social media messages, the following occurred:

a.    On March 14, 2023, a confidential informant ("CI-1")[2] sent a direct message to V. SANCHEZ at V. SANCHEZ's Instagram account asking to purchase marijuana that V. SANCHEZ had advertised for sale through an Instagram story. V. SANCHEZ agreed and directed CI-1 to meet the following day.

b.    On March 15, 2023, V. SANCHEZ told CI-1 via a direct message from his Instagram account to pick up the drugs from his friend at a location on W. Holt Avenue in Pomona, California (the "W. Holt Avenue location").

---

[1] Before each undercover transaction listed in this affidavit, law enforcement officers met with the relevant CI, searched the relevant CI and CI's car for contraband, and found none. Then, law enforcement provided the relevant CI with ATF funds to conduct the purchase, equipped the relevant CI with electronic audio/video surveillance equipment, and listened in real time. After the transaction, law enforcement reviewed the recording equipment and confirmed that it functioned properly and captured the transaction.

[2] CI-1 has worked for ATF since 2011. He/she has felony convictions for RICO in 2010 and possession of a controlled substance in 1997. He/she has received approximately $353,250 for his/her cooperation. Agents have found CI-1 to be reliable and credible.

26.   Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   Shortly thereafter, CI-1 met with CASTRO at the parking lot of the W. Holt Avenue location who sold CI-1 approximately one ounce of marijuana and 2.47 grams of cocaine. CASTRO gave CI-1 his phone number and said he was from Puente-13 and could continue to supply CI-1 with drugs and firearms.

27.   CI-1 drove to the pre-determined meeting location, where ATF SAs recovered 2.47 grams of a mixture and substance containing a detectable amount of cocaine, which was subsequently confirmed by Drug Enforcement Administration ("DEA") laboratory testing.

### D.   MARCH 22, 2023: V. SANCHEZ AND FAUSTO SELL 100 FENTANYL PILLS, 5.22 GRAMS OF METHAMPHETAMINE, AND ONE FIREARM TO ATF CONFIDENTIAL INFORMANT

28.   Based on my review of social media messages, the following occurred:

a.   On March 22, 2023, V. SANCHEZ posted an Instagram story to his Instagram account advertising a "jar" of M30 pills for $200.  Based on my training and experience, I know that a "jar" is slang for "100" and M30 pills are counterfeit oxycodone pills, which often contain fentanyl.  CI-2[3] sent a direct message to V. SANCHEZ's Instagram account asking to purchase the pills.

---

[3] CI-2 was previously in a criminal street gang but informed me in 2023 that he/she is no longer affiliated with the gang. CI-2 has not received any felony convictions. CI-2 has been paid approximately $77,200 over five years. Agents have found CI-2 to be reliable and credible.

V. SANCHEZ told CI-2 to go to a residence on W. Monterey Ave.,
Pomona, California to meet ("W. Monterey Residence").

      b.   Still on March 22, 2025, V. SANCHEZ posted
another Instagram story, "P80 4 the go."  I know based on my
training and experience that Polymer 80 handguns are often
referred to as "P80s" and are popular among gang members.

    29.  Based on my conversations with the CI, and my review
of the audio/video recording and law enforcement reports, the
following occurred:

      a.   Law enforcement saw CI-2 arrive at the W.
Monterey Residence, where he/she met with FAUSTO who introduced
himself as V. SANCHEZ's cousin.  CI-2 asked FAUSTO about the
handgun for sale and FAUSTO appeared to call V. SANCHEZ and
speak to him on speakerphone in front of CI-2.  FAUSTO said,
"Hey Pollo, you're selling a P80? . . . How much? . . . $800."
FAUSTO told CI-2 that the firearm was at a nearby house and that
they would go get it together.  I listened to an audio and video
recording of the controlled purchase and recognized the person
speaking to FAUSTO over the phone as V. SANCHEZ.

      b.   FAUSTO, CI-2, and two children entered FAUSTO's
car.  Law enforcement surveilled them as they drove to a
residence at 428 Jansu Place in Pomona, California 91768.  At
the residence, FAUSTO took CI-2 to the garage and retrieved a
firearm from the top of a refrigerator and handed it to CI-2.
FAUSTO drove CI-2 back to the original location, went inside,
and returned with a box of 9mm ammunition and 100 M30 pills in a

28

plastic bag.  CI-2 purchased the firearm, ammunition, and M30 pills and FAUSTO provided CI-2 with his phone number.

c.    During the transaction, FAUSTO showed CI-2 his bullet wounds from previous shootings and told CI-2 he prefers revolvers because revolvers don't eject their shell casings once fired, and it becomes more difficult for law enforcement to track the firearms.  FAUSTO said he doesn't like pistols because the shell casings fly everywhere and can be evidence but that he will use Glock 19s with silencers.  FAUSTO also told CI-2 that he was present when a friend did a shooting but got arrested because the shell casing landed in his hoodie.

30.  Based on my review of social media messages, the following occurred:

a.    Later that night, CI-2 sent V. SANCHEZ a direct message to his Instagram account thanking him for setting up the deal.  V. SANCHEZ replied, "it was just $900 for the gun or u got other stuff off him to pops just wanna make sure . . . fosho I know hes my cuzin just make sure what he sold n shit u know . . . gotta keep track."

31.  The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 10.60 grams of a mixture and substance containing a detectable amount of fentanyl; (ii) 5.22 grams of methamphetamine; and (iii) one privately manufactured 9mm caliber firearm.

E.   **APRIL 5, 2023: V. SANCHEZ SELLS 1,000 FENTANYL PILLS,
441 GRAMS OF METHAMPHETAMINE, AND ONE FIREARM TO ATF
CONFIDENTIAL INFORMANT**

32.   Based on my review of social media messages, the
following occurred:

a.   On March 29, 2023, V. SANCHEZ sent a direct
message from his Instagram account to CI-2 saying, "just seeing
uf u need anything" to which CI-2 said he/she would be back in
town in a few days and wanted to do a deal.  On March 31, 2023,
after viewing a Live Story of a handgun on V. SANCHEZ's
Instagram account, CI-2 asked V. SANCHEZ for a price, to which
V. SANCHEZ replied, "1k in Pomona."  Additionally, V. SANCHEZ
agreed to sell CI-2 a pound of methamphetamine and 1,000 M30
fentanyl-based pills.

b.   On April 5, 2023, V. SANCHEZ sent a direct
message on Instagram to CI-2 reading, "ima go pick up the burner
rn."  Based on my training and experience, I know "burner" to be
coded language for a firearm.  V. SANCHEZ said he had the pills
with him and asked if CI-2 wanted to meet at his cousin,
FAUSTO's house, which CI-2 agreed to do.

33.   Based on my conversations with the CI, and my review
of the video/audio recording and law enforcement reports, the
following occurred:

a.   Once at the W. Monterey Residence, V. SANCHEZ
approached CI-2's vehicle with the handgun and the fentanyl
pills.  As CI-2 paid for the firearm and fentanyl, V. SANCHEZ
said the methamphetamine was at another location and that CI-2
should follow him to pick up the methamphetamine.  Surveillance

30

units followed CI-2 as he/she followed V. SANCHEZ to the Virginia Square Townhomes located on Murchison Avenue in Pomona, California 91768.  Surveillance units and CI-2 noted that there was an additional occupant in the vehicle with V. SANCHEZ.  V. SANCHEZ told CI-2 to wait outside the gate as he went inside to pick up the pound of methamphetamine.

b.    Minutes later, V. SANCHEZ returned from the apartment complex with a shoe box containing the pound of methamphetamine.  As CI-2 paid V. SANCHEZ for the methamphetamine, he/she asked who was in the vehicle that V. SANCHEZ came in, V. SANCHEZ responded that it was his younger brother, who I identified as Lucky SANCHEZ.

34.    The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 105.25 grams of a mixture and substance containing a detectable amount of fentanyl; (ii) 441 grams of methamphetamine; and (iii) Polymer 80, model PF940C, 9mm caliber handgun, bearing no serial number (commonly referred to as a "ghost gun").  The drug amounts were subsequently confirmed by DEA laboratory testing.

**F.    APRIL 5, 2023: V. SANCHEZ SELLS 113 GRAMS OF METHAMPHETAMINE AND ONE FIREARM TO ATF CONFIDENTIAL INFORMANT**

35.    Based on my review of social media messages, the following occurred:

a.    On April 5, 2023, CI-1 sent a direct message to V. SANCHEZ's Instagram account asking if V. SANCHEZ had firearms for sale.  V. SANCHEZ replied with a photograph of what appeared to be a Polymer 80 handgun and offered to sell it for $800.  A

short while later, V. SANCHEZ messaged CI-1 on Instagram saying the original handgun was gone, but that he had an additional handgun with ammunition for $1,000.  V. SANCHEZ agreed to meet CI-1 at a "casita,"[4] and sell CI-1 a quarter pound of methamphetamine in addition to the firearm.  V. SANCHEZ sent CI-1 the address to the casita, located at 1470 W. Holt Avenue, Pomona, California.

36.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.  Later that evening, V. SANCHEZ and CI-1 met at the casita.  V. SANCHEZ approached CI-1 and told CI-1 that he had the handgun with him and the methamphetamine would be delivered shortly.  V. SANCHEZ and CI-1 went to the parking lot as V. SANCHEZ produced one SMI-MA Kahr Arms, model K40, .40 caliber pistol, bearing serial number DF4340 and sold it to CI-1.  Minutes later, a vehicle arrived at the parking lot and V. SANCHEZ sold the quarter pound of methamphetamine from the vehicle to CI-1.

37.  The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 113.4 grams of methamphetamine; and (ii) one SMI-MA Kahr Arms, model K40, .40 caliber pistol, bearing serial number DF4340 and ammunition.

---

[4] Based on my training and experience, I know a "casita" is an illegal, underground casino.

### G.   JUNE 1, 2023: FAUSTO AND V. SANCHEZ SELL 500 PILLS TO ATF CONFIDENTIAL INFORMANT

38.   Based on my review of social media messages, the following occurred:

a.   On May 30, 2023, CI-2 sent a direct message to V. SANCHEZ on Instagram asking if V. SANCHEZ had any firearms, methamphetamine, and fentanyl pills for sale.  V. SANCHEZ affirmed, telling CI-2, "Fosho I'ma line that up" for the following day.

b.   On June 1, 2023, V. SANCHEZ sent CI-2 a message on Instagram saying he was unable to get the two firearms and methamphetamine but could still sell the fentanyl pills which CI-2 agreed to.  V. SANCHEZ directed CI-2 to meet at FAUSTO's house to pick up the fentanyl pills.

39.   Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   Hours later, CI-2 drove to and met with FAUSTO in front of the W. Monterey Residence.  FAUSTO sold the 500 M30 fentanyl-based pills to CI-2 for $500 and discussed different firearms he had access to that he would be willing to sell to CI-2 at a later date, stating that he had a "Draco"[5] at the house but did not specify which house.

40.   The CI drove to the pre-determined meeting location, where ATF SAs recovered 53.13 grams of a mixture and substance containing a detectable amount of fentanyl.

---

[5] Based on my training and experience I know that AK-style pistols are commonly referred to as Dracos.

### H. JUNE 7, 2023: CASTRO SELLS ONE FIREARM AND AN OUNCE OF COCAINE TO ATF CONFIDENTIAL INFORMANT

41. Based on my review of social media messages, the following occurred:

a. On June 1, 2023, CASTRO posted an Instagram Story to his Instagram account offering cocaine for sale. CI-2 sent CASTRO a direct message asking for the price of an ounce of cocaine, to which CASTRO replied $850. On June 4, 2023, CASTRO posted another Instagram Story offering a pistol for sale. As CI-2 inquired about the firearm, CASTRO told him/her that the firearm came with an extended magazine and 100 rounds of ammunition. CASTRO and CI-2 coordinated to meet in the following days to do the deal.

b. On June 7, 2023, CASTRO sent CI-2 an address on S. Cerritos Ave., Azusa, California to meet (the "S. Cerritos Apartments").

42. Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a. As CI-2 arrived at the S. Cerritos Apartments, CASTRO exited and entered CI-2's vehicle with an HS Produkt Springfield Armory, model XD, 9mm handgun, bearing serial number XD887601 he offered to sell, while telling CI-2 they had to go to a nearby address to pick up the ammunition. CASTRO directed CI-2 to an apartment building located on N. Grand Ave, Covina, California (the "N. Grand Ave. Apartments") which CASTRO referred to as his sister's apartment. Upon arrival, CI-2

34

waited inside the car as CASTRO picked up the ammunition from the apartment, returning minutes later.

      b.   CASTRO directed CI-2 to a Shell gas station located at 1518 N Garey Ave, Pomona, California where a silver Honda Accord bearing Washington license plate ending in -0660 entered the parking lot and parked next to CI-2's vehicle.  A co-conspirator ("CC-4") exited from the Honda and got into the rear seat of CI-2's vehicle.  CC-4 agreed to sell an ounce of cocaine to CI-2 for $900 while offering to sell CI-2 firearms later.  CASTRO then left the area with CC-4.

    43.   The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 27.95 grams of a mixture and substance containing a detectable amount of cocaine and (ii) one HS Produkt Springfield Armory, model XD, 9mm handgun, bearing serial number XD887601 and ammunition.

    **I.   JUNE 13, 2023: CASTRO, L. SANCHEZ, PONCE, AND MEJIA SELL TWO FIREARMS AND ONE SHORT-BARRELED RIFLE TO AN ATF CONFIDENTIAL INFORMANT; CASTRO AND L. SANCHEZ SELL ONE FIREARM TO AN ATF CONFIDENTIAL INFORMANT; CASTRO SELLS COCAINE TO AN ATF CONFIDENTIAL INFORMANT**

    44.   Based on my review of social media messages, the following occurred:

      a.   On June 8, 2023, CASTRO sent CI-2 a text message saying he had a shotgun for sale and had a friend who had an AR-style rifle for sale as well.  The two discussed prices for firearms available and CASTRO said they were, "first come first serve" but that he had cocaine to sell to CI-2.  CASTRO proceeded to send pictures of the firearms to CI-2, advertising

the sale of them with prices that third party individuals had for sale.

     b.   On June 13, 2023, CASTRO messaged CI-2 to meet at FAUSTO's Residence.

   45.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

     a.   Upon arrival at the W. Monterey Residence, CI-2 met with CASTRO, L. SANCHEZ, and FAUSTO in front of the residence.  Both CASTRO and L. SANCHEZ got inside CI-2's vehicle as CASTRO directed CI-2 to 1104 W Edna Pl, Covina (the "W. Edna Residence").

     b.   Upon arrival at the W. Edna Residence, CASTRO and L. SANCHEZ led CI-2 to the rear garage where PONCE and MEJIA were inside with multiple firearms spread across the table. MEJIA showed CI-2 how to operate an LW Schneider Inc., Springfield Armory, model Saint, multi-caliber rifle, bearing serial number ST166939 as CASTRO inspected an A.C.P., Mitchell, model 9108 BL, 12-gauge shotgun, bearing serial number 691801. CI-2 confirmed the price with MEJIA who wiped down the firearm of fingerprints.  CI-2 handed the money to CASTRO who gave a portion to MEJIA.  MEJIA asked if CI-2 was interested in an additional firearm and produced a privately manufactured short-barreled rifle, bearing no serial number (commonly referred to as a "ghost gun"), describing it as a "tiny one… mini compact." MEJIA agreed to sell the short-barreled rifle to CI-2.  CI-2 loaded the three firearms in his/her vehicle as he/she, CASTRO,

and L. SANCHEZ got back inside CI-2's vehicle and drove to the next location.

c.    As CASTRO waited to hear from a co-conspirator regarding an additional rifle for sale, CASTRO sold CI-2 an ounce of cocaine.

d.    CASTRO directed CI-2 to an area near 778 Laurel Ave, Pomona, where a co-conspirator met with CI-2, CASTRO, and L. SANCHEZ at CI-2's vehicle.  CASTRO retrieved one Ruger, model AR-556, 5.56 caliber rifle, bearing serial number 857-49363 from the co-conspirator's vehicle.  CI-2 paid CASTRO who handed the money to the co-conspirator.

46.    The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 21.2 grams of a mixture and substance containing a detectable amount of cocaine; (ii) one A.C.P., Mitchell, model 9108 BL, 12-gauge shotgun, bearing serial number 691801; (iii) one privately manufactured short-barreled rifle[6], bearing no serial number (commonly referred to as a "ghost gun"); (iv) one LW Schneider Inc., Springfield Armory, model Saint, multi-caliber rifle, bearing serial number ST166939; and (v) one Ruger, model AR-556, 5.56 caliber rifle, bearing serial number 857-49363. The drug amounts were subsequently confirmed by DEA laboratory testing.

---

[6] ATF examined the firearm and has determined the barrel length is less than 16 inches in length and is not registered to either PONCE or MEJIA in the National Firearms Registration and Transfer Record.

a.    I have included a photograph of the firearms below:



**J.    JUNE 28, 2023: CASTRO AND GORDIAN-PADILLA SELL ONE FIREARM TO AN ATF CONFIDENTIAL INFORMANT; CASTRO AND DOMINGUEZ SELL ONE FIREARM TO AN ATF CONFIDENTIAL INFORMANT; CASTRO AND KANG SELL COCAINE TO AN ATF CONFIDENTIAL INFORMANT; CASTRO AND CARMONA SELL ONE MACHINEGUN AND RIFLE TO AN ATF CONFIDENTIAL INFORMANT**

47.    Based on my review of social media messages, the following occurred:

a.    On June 16, 2023, CASTRO sent a text message to CI-2 reading, "the homie got some more that came in today" and sent five photographs of different firearms.  CASTRO and CI-2 discussed what firearms were available and their prices, in addition to cocaine CASTRO had for sale.

b.    On June 27, 2023, GORDIAN-PADILLA posted an Instagram Live Story offering to sell a handgun.  CI-2 sent GORDIAN-PADILLA a direct message saying he/she would purchase the firearm.  GORDIAN-PADILLA sent a video of the firearm to CI-

38

2 and agreed to sell it.  Later that day, CASTRO sent a text message to CI-2 asking if he/she was buying the firearm from GORDIAN-PADILLA and said they could pick up the gun along with the others together.

48.  Based on my conversations with CI-2, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.  On June 28, 2023, CI-2 picked up CASTRO from a residence on South Cerritos Avenue in Azusa, California ("South Cerritos Residence") and directed CI-2 to the intersection of Tierra Luna and Iluso Avenue in West Covina, California.  Upon arrival, GORDIAN-PADILLA parked his Toyota Corolla near CI-2's vehicle.  CI-2 gave CASTRO the money for the firearm as CASTRO exited and got inside GORDIAN-PADILLA's vehicle.  Moments later, CASTRO exited holding a firearm box and reentered CI-2's vehicle with a Polymer 80 PF940SC, 9mm caliber handgun, with a Glock 27 slide attached, bearing serial number CACB084 on the slide .

b.  CASTRO then directed CI-2 to a residence on East Nanette Avenue in West Covina, California where they met with DOMINGUEZ inside a garage ("East Nanette Residence").  DOMINGUEZ told CI-2 that he'd sell his handgun for $1,000 if CI-2 was interested.  As this happened, KANG entered the garage and introduced himself as "Easy."  KANG produced a bag of cocaine and handed it to CI-2, selling the ounce for $700.  CI-2 paid for an HS Produkt, Springfield Armory, model XDS, .45 ACP caliber pistol, bearing serial number BA572766 from DOMINGUEZ and the cocaine from KANG before he/she and CASTRO got back

inside CI-2's vehicle.  In the car, CASTRO offered to sell another bag of cocaine to CI-2 for $500. CI-2 agreed to the offer from CASTRO.

  c. CASTRO directed CI-2 to a residence on Alwood Street in La Puente, California ("Alwood Residence").  Upon arriving, CARMONA was standing in front of the residence. CASTRO told CI-2 to wait in the car as CASTRO took CI-2's money and went inside the house with CARMONA.  Minutes later, CASTRO and CARMONA exited the residence and loaded one I.O. Inc., model Sporter, 7.62x39 caliber rifle, bearing serial number 024470; one Glock, model 19x, 9x19mm caliber pistol, bearing serial number BGWS391 with a machinegun conversion device[7] secured to the rear of the slide of the firearm; and one Glock, model 27 Gen 5, .40 caliber pistol, bearing serial number BXMU613 in the vehicle as CASTRO told CI-2 one was a "Glock with a switch on it" with a drum magazine from CARMONA in addition to a rifle.

  d. CASTRO directed CI-2 back to his residence where a neighbor had a rifle for sale.  CASTRO and CI-2 met with the unknown male and purchased a Companhia Brasileira de Cartuchos (CBC), Mossberg International, model 715T, .22 caliber rifle, bearing serial number EVB4581056 from him.  CASTRO entered his residence following the deal.

  49. The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 27.8 grams of a mixture and substance containing a detectable amount of cocaine; (ii) 12.7

---

  [7] ATF has examined the machinegun conversion device and determined that it allows a semi-automatic firearm to function fully automatic as a machinegun.

grams of a mixture and substance containing a detectable amount of cocaine; (iii) one Polymer 80, model PF940SC, 9mm handgun, with a Glock 27 slide attached, bearing serial number cacb084 on the slide; (iv) one HS Produkt, Springfield Armory, model XDS, .45 ACP caliber pistol, bearing serial number BA572766; (v) one I.O. Inc., model Sporter, 7.62x39 caliber rifle, bearing serial number 024470; (vi) one Glock, model l9x, 9x19mm caliber pistol, bearing serial number BGWS391; (vii) one Glock, model 27 Gen 5, .40 S&W caliber pistol, bearing serial number BXMU613; and (viii) one Companhia Brasileira de Cartuchos (CBC), Mossberg International, model 715T, .22 Long Rifle caliber rifle, bearing serial number EVB4581056. The drug amounts were subsequently confirmed by DEA laboratory testing.

a.    I have included a photograph of the recovered items below:



41

K.    **JULY 20-21, 2023: LOPEZ, COVARRUBIAS, CASTILLO, AND
JOHNSON KIDNAP VICTIMS A.A. AND A.C.**

1.    Summary of Evidence of the Puente-13 Street
Gang's Involvement

50.    As set forth below, there is probable cause to believe
that LOPEZ, COVARRUBIAS, CASTILLO, and JOHNSON participated in
the kidnapping of Victims A.A. and A.C. (collectively "the
victims") between July 20-21, 2023.  The evidence supporting
this determination includes, but is not limited to: (1) review
of law enforcement reports, (2) speaking with officers familiar
with the investigation, (3) interviews with the kidnapping
victims, (4) review of call detail records and cellphone tower
records, (5) review of social media accounts regarding the
kidnapping.

2.    Description of the Kidnapping

51.    Based on my personal observations, my training and
experience, and information obtained from various law
enforcement personnel and witnesses, I am aware of the
following:

a.    On July 8, 2023, COVARRUBIAS contacted the San
Bernardino County Sheriff's Department ("SBSD") to report a
burglary that occurred at her and LOPEZ's shared residence at
17825 Grapevine Lane, San Bernardino, CA ("LOPEZ's Residence").
COVARRUBIAS told law enforcement the robbery took place while
they were out of town.  Officers took a burglary report for
jewelry that was reported stolen.  COVARRUBIAS told officers

42

that she and LOPEZ gave the home's keys to A.A. to have him do
work on LOPEZ's vehicle.

b.    On or about July 21, 2023, A.A. and A.C.
(collectively, the "Victims") reported to SBSD deputies that
they were kidnapped from July 20, 2023, until the next night
when A.C. was let go and A.A. escaped.  They reported that they
were kidnapped by LOPEZ and COVARRUBIAS, and that LOPEZ and
COVARRUBIAS beat A.A. to get items they believed were stolen
from them.

c.    A.A. told law enforcement that A.A. had known
LOPEZ since childhood and knew COVARRUBIAS as LOPEZ's
girlfriend.  According to A.A., in early July 2023, LOPEZ asked
A.A. to get LOPEZ's car fixed and drop it off at LOPEZ's house
while LOPEZ and COVARRUBIAS went out of town.  In exchange,
LOPEZ promised to pay A.A.  A.A. said he fixed the car and
returned it to LOPEZ's Residence.  Then, on July 20, 2023, LOPEZ
asked A.A. to come to LOPEZ's Residence.  A.A. and A.C. went to
LOPEZ's Residence.  A.C. waited in their car, and A.A. met LOPEZ
outside before both went inside.  Once inside, A.A. was
surrounded by LOPEZ and two other men, later identified as
CASTILLO and an unknown male.  During this time, COVARRUBIAS and
JOHNSON stood nearby.[8]

d.    The group demanded to know the location of
missing property (jewelry), which went missing while LOPEZ and

---

[8] The Victims knew COVARRUBIAS and LOPEZ well and were able
to identify them by photo. Victim A.C. later found JOHNSON and
L. CASTILLO's Instagram pages, and the Victims identified them
as the individuals appearing on the Instagram pages.

COVARRUBIAS were out of town.  The group told A.A. they believed
the Victims stole the missing property.  The unknown male
brandished a firearm and put it in A.A.'s face while asking
about the property.  When A.A. told the men that he did not have
the jewelry, the men began attacking him while threatening that
he could not leave the house until he returned the property.
A.A. was repeatedly struck with a 3-foot metal pole as LOPEZ,
CASTILLO, and the unknown male continued to question A.A.

   e. While A.A. was inside being beaten and
questioned, COVARRUBIAS and JOHNSON went outside and approached
A.C. and questioned A.C. about the stolen jewelry.  CASTILLO
then went outside and told A.C. that the more A.C. lied, the
more A.A. would get beat up inside.  A.C. continued to deny that
they stole the jewelry, and COVARRUBIAS got in the Victims' car,
sitting in the driver's seat while JOHNSON sat in the backseat.
COVARRUBIAS told A.C. that she was taking A.C. to El Monte to
check the Victims' home for the stolen jewelry.  A.C. then was
forced by the two women to go to A.C.'s home.  A.C. was in fear
of A.C. and A.A.'s safety and, accordingly, complied with their
demands.  COVARRUBIAS then drove A.C. and JOHNSON to the
Victims' residence and forced A.C. to let them inside.
COVARRUBIAS and JOHNSON ransacked the residence looking for the
jewelry but found nothing.  Before leaving, COVARRUBIAS took
multiple photographs of the inside of the residence.

   f. COVARRUBIAS and JOHNSON told A.C. to get back in
the car.  A.C. complied with their demands because she was
scared for her own safety and the safety of A.A.  COVARRUBIAS

then drove A.C. to A.A.'s sister's residence ("B.A.") in the La Puente/West Covina area.  At the residence, COVARRUBIAS questioned B.A. regarding the whereabouts of the jewelry but was still unable to locate it.

g.    COVARRUBIAS and JOHNSON then took A.C. back to LOPEZ's Residence where A.A. was still being held and beaten. A.C. watched as COVARRUBIAS beat A.A. with a 3-foot object.  At this time, COVARRUBIAS told A.C., "I would have blown his head off already....  I would have had him dead already."  A.A. then gave the name of "Lester," who was an acquaintance of A.A. and LOPEZ.  A.A. said Lester was someone to ask about the jewelry in an attempt to escape with A.C.

h.    A.C. convinced COVARRUBIAS that she had to leave to go pick up her mother so that her mother would not become suspicious as to her whereabouts.  COVARRUBIAS let A.C. leave, but the group forced A.A. to stay inside the house.  The group told A.A. he could not leave, while CC-1 held the firearm. While still at the location, CASTILLO told A.A. that he would be tortured and killed.  LOPEZ, CASTILLO, and CC-1 then told A.A. to get into COVARRUBIAS's car and drove him to Diamond Bar so they could confront Lester while A.A. remained in their custody. At the residence, A.A. pleaded to Lester.  However, Lester, Lester's father, LOPEZ, CASTILLO, and CC-1 all attacked A.A. in the front yard.  After being knocked down, A.A. was able to make it back to his feet and run towards an approaching car.  A.A. was able to get inside the unknown person's car, who gave A.A. a

ride to the Fontana Police Station.  At the Fontana Police
Station, A.A. called A.C. and met with her at the station.

        i.   I was able to review the photos of Alvarez that
law enforcement took contemporaneous with his report to police,
and his appearance is consistent with being beaten with a metal
pole.

        j.   Deputies created two photographic line ups for
the victims, one containing LOPEZ and the other containing
COVARRUBIAS, among other individuals.  Both A.A. and A.C.
identified LOPEZ and COVARRUBIAS in the photo lineups separate
from one another.

        k.   On or about July 22, 2023, A.C. contacted San
Bernadino County Detective Sims and said that she found two of
the kidnapping suspects.  A.C. said she found the Instagram
pages for both suspects and identified them by the pictures on
their profiles, which contained their distinct tattoos and
appearances.  A.C. identified one suspect from the Instagram
profile @lildeebst13 (like CASTILLO's moniker) and the second
suspect from the Instagram profile @heatherkissez1 (like
JOHNSON's first name).  Based on the review of the Instagram
profiles, law enforcement identified CASTILLO and JOHNSON.

        l.   Law enforcement also interviewed A.A.'s
relatives, who confirmed A.A.'s kidnapping was by COVARRUBIAS
and JOHNSON.

        m.   Based on CASTILLO's historical cell site
information, CASTILLO's phone made and received multiple phone

calls around the time of the kidnapping around LOPEZ's Residence, including to COVARRUBIAS.

n.    On July 11, 2024, United States Magistrate Judge, the Honorable Brianna Mircheff authorized a historical cellular GPS warrant for the phones believed to be used by CC-1 and JOHNSON in Case Number: 2:24-MJ-4146.

i.    The evidence received from the 2:24-MJ-4146 warrant showed that JOHNSON's phone location was consistent with A.C.'s report of her movements during the kidnapping and the other phone location evidence derived from the data obtained as a result of the 2:24-MJ-0531 warrant regarding COVARRUBIAS's and A.C.'s phone location data.  JOHNSON's phone traveled in and around the area of COVARRUBIAS's phone, coinciding with A.C.'s statement and B.A. statements of JOHNSON and COVARRUBIAS going to their house.

o.    On August 28, 2023, LOPEZ was arrested while attempting to gain entrance to the Victims' residence in El Monte.  The Victims told me they called the police when they heard LOPEZ outside banging on their door demanding to speak with them.

p.    On August 29, 2023, SBSD's officers served a search warrant at the LOPEZ Residence.  During a search of the house, officers recovered three firearms, including two handguns, ammunition, and a metal iron rod matching the description of the object used by the suspects to beat A.A.

q.    On July 25, 2024, the Honorable Charles Eick, United States Magistrate Judge for the Central District of

47

California, authorized the search of an Instagram account believed to be used by CC-1. (Case No. 2:24-MJ-4407.) Upon reviewing the contents of the account, law enforcement learned the following:

i.   The evidence obtained through the search of CC-1's Instagram account included messages from CC-1 to other Puente-13 gang members saying that he was at LOPEZ's Residence on July 19, 2023. The person he messaged said that he was going to be getting ammunition for them and asked if CC-1's gun was a "9 or 40?" CC-1 replied, a "9." "9" in the context of firearms often refers to a 9mm handgun.

ii.   On July 20, 2023, CC-1 messaged V. SANCHEZ, asking for V. SANCHEZ to pick him up "from Adrian's." Adrian is LOPEZ's first name.

iii.  On August 29, 2023, following the search warrant conducted by SBSD's office, CC-1 messaged with F. RODRIGUEZ, telling F. RODRIGUEZ that the police just served the warrants at the house. CC-1 told F. RODRIGUEZ, "Nigha straight raided Adrian's house" ... "nigha the juras [police] pulled up to the door nd my heat (gun) was in my waist I stashed it … and than we got us … they found my shot took a L … didn't get charged for shit tho." F. RODRIGUEZ asked, "What they tryna get Adrian for," to which CC-1 replied, "kidnapping."

r.   On January 2, 2025, the Honorable Rozella Oliver, United States Magistrate Judge for the Central District of California, authorized the search of six Instagram accounts believed to be used by LOPEZ, COVARRUBIAS, JOHNSON, CASTILLO,

A.A., and A.C.  (Case No. 2:25-MJ-00003.)  These accounts contained the following:

      i.  The evidence obtained through the search of JOHNSON's Instagram account included messages with LOPEZ the day before the kidnapping, including a message from LOPEZ to JOHNSON reading, "Hey can you tell my cousin[9] to call me I really need his help with something today I think I know who got my stuff."

      ii.  On August 29, 2023, while messaging with Instagram user "yammi_lette1," JOHNSON wrote, "Hey I'm sorry about last night my cousin got busted for kidnapping so it was all kinds of drama last night."

      iii. On September 10, 2023, LOPEZ sent a message to JOHNSON reading, "Show lil d[10] this I been looking shit up." The message was accompanied by two screenshots from website 'kentsoverlaw.com' regarding the legality of kidnapping and ways to justify it.

      iv.  The evidence obtained through the search of CASTILLO's Instagram account included a message with a suspected Puente-13 member, P.L. on July 21, 2023, asking if CASTILLO was going to a show that night.  CASTILLO replied, "Nah I barely woke up I was with monkey till 330 in the morning," indicating that he was with LOPEZ until past the time of the kidnapping.

---

[9] Based on my familiarity with this investigation, I know that CASTILLO is LOPEZ's cousin, and CASTILLO and JOHNSON are in a romantic relationship.

[10] Based on my familiarity with this investigation, I know that "lil d" or "Lil Dee" is CASTILLO's moniker.

**L.   AUGUST 2, 2023: V. SANCHEZ SELLS ONE SHORT-BARRELED
RIFLE TO ATF CONFIDENTIAL INFORMANT; V. SANCHEZ AND
FAUSTO SELL TWO FIREARMS TO ATF CONFIDENTIAL INFORMANT**

52.   Based on my review of social media messages, the
following occurred:

a.   On August 1, 2023, CI-1 sent a direct message to
V. SANCHEZ's Instagram account asking if V. SANCHEZ had any
firearms for sale.  V. SANCHEZ asked how many CI-1 wanted and
sent a photograph of what appeared to be 10 firearms of all
different types, makes, and models on a couch.  V. SANCHEZ sent
an additional photograph of a rifle and the two discussed
purchasing three firearms for the following day.

b.   On August 2, 2023, V. SANCHEZ told CI-1 to meet
near the W. Monterey Residence.

53.   Based on my conversations with the CI, and my review
of the video/audio recording and law enforcement reports, the
following occurred:

a.   Upon arrival, V. SANCHEZ got inside CI-1's
vehicle and directed CI-1 to the area of 2003 Evergreen Street,
La Verne.  V. SANCHEZ exited the vehicle and met with an unknown
female who handed one short-barreled, privately manufactured
rifle[11] bearing no serial number (commonly referred to as a
"ghost gun") to V. SANCHEZ to place in CI-1's vehicle.  CI-1
paid V. SANCHEZ who gave a portion to the female before CI-1 and
V. SANCHEZ drove back to the W. Monterey Residence.

---

[11] ATF has determined the barrel length is less than 16
inches in length.

b.   Upon arriving at the W. Monterey Residence, CI-1
and V. SANCHEZ went inside and met with FAUSTO.  On the couch
was a black rifle box containing one L.A.R. Manufacturing Inc.,
Bushmaster Firearms, model XM 15-E2S, .223-5.56mm caliber rifle,
bearing serial number L150443 for sale as FAUSTO retrieved one
Smith & Wesson, model 60, .38 S&W Special caliber revolver,
bearing serial number BAB6611 from his bedroom.  CI-1 negotiated
the price of the two firearms with FAUSTO and V. SANCHEZ before
paying V. SANCHEZ for both.  FAUSTO told CI-1 that he had more
firearms at his mother's house including silencers.

54.  The CI drove to the pre-determined meeting location,
where ATF SAs recovered: (i) one short-barreled, privately
manufactured rifle[12] bearing no serial number (commonly referred
to as a "ghost gun"); (ii) one L.A.R. Manufacturing Inc.,
Bushmaster Firearms, model XM 15-E2S, .223-5.56mm caliber rifle,
bearing serial number L150443; and (iii) one Smith & Wesson,
model 60, .38 S&W Special caliber revolver, bearing serial
number BAB6611.

**M.   AUGUST 8, 2023: CASTRO SELLS ONE FIREARM TO ATF
CONFIDENTIAL INFORMANT; CASTRO AND CARMONA SELL FOUR
FIREARMS TO ATF CONFIDENTIAL INFORMANT**

55.  Based on my review of social media messages, the
following occurred:

a.   On August 7, 2023, CI-2 sent CASTRO a text
message asking if CASTRO could meet the following day to sell
CI-2 firearms.  CASTRO agreed and sent a photograph of what

---

[12] ATF has determined the barrel length is less than 16
inches in length.

appeared to be 10 firearms of all different types, makes, and models on a couch, which was the same photograph V. SANCHEZ sent CI-1 on August 1, 2023.  CASTRO told CI-2 he knew of other people with firearms for sale and could arrange the purchase of other deals as well.

b.    On August 8, 2023, CASTRO told CI-2 to meet at an address on Amar Road in La Puente, California.

56.   Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.    CI-2 met CASTRO at the Amar Road location. CASTRO entered CI-2's vehicle and directed CI-2 to drive to a residence on Otis Avenue in Cudahy, California (the "Otis Avenue Residence") where CI-2 picked up a co-conspirator.  The co-conspirator then directed CI-2 to drive to a residence on Santa Ana Street in Bell Gardens, California.  CI-2 paid CASTRO $2,000 as CASTRO and the co-conspirator exited the vehicle and went inside the residence, returning minutes later with a black trash bag that contained one privately manufactured handgun, bearing no serial number (commonly referred to as a "ghost gun"), and ammunition.  CASTRO received a phone call from CARMONA and told him they'd be on their way as CI-2 dropped the co-conspirator off at the Otis Avenue Residence.

b.    CASTRO then directed CI-2 to a residence on Doublegrove Street in La Puente, California while calling CARMONA and telling him that they had arrived.  CI-2 paid CASTRO as CASTRO met CARMONA in front of the Doublegrove Residence and

went inside.  Minutes later, CASTRO returned to CI-2's vehicle
with a black duffle bag containing four firearms.  CASTRO went
back inside the residence with CARMONA as CI-2 left.

57.  The CI drove to the pre-determined meeting location,
where ATF SAs recovered: (i) one privately manufactured handgun,
bearing no serial number (commonly referred to as a "ghost
gun"); (ii) one German Sport Guns, American Tactical (ATI),
model GSG-MP40, 9x19mm caliber pistol, bearing serial number
A917005; (iii) one Beretta, model 92FS, 9mm Parabellum caliber
pistol, bearing serial number BER169445Z ; (iv) one Glock, model
19 Gen 4, 9x19mm caliber pistol, bearing serial BEHX808; and (v)
one Glock, model 42, .380 Auto caliber pistol, bearing serial
number AGFF879.

a.   I have included a photograph of the firearms
below:



**N.   AUGUST 10, 2023: CASTRO AND ORNELAS SELL ONE FIREARM
TO ATF CONFIDENTIAL INFORMANT**

58.  Based on my review of social media messages, the
following occurred:

a.    On August 9, 2023, ORNELAS posted a Story to Instagram of a Glock handgun for sale.  CI-2 sent ORNELAS a direct message asking to buy the firearm to which ORNELAS agreed to.  The two agreed to meet the following day to do the deal.

b.    On August 10, 2023, CI-2 and ORNELAS agreed to meet in a parking lot located at 2980 E Workman Avenue, West Covina.

59.    Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.    On August 10, 2023, CI-2 met with ORNELAS and CASTRO in the parking lot at 2980 E Workman Avenue.  As CASTRO kept lookout, CI-2 paid ORNELAS for one Glock, model 48, 9x19mm caliber pistol, bearing serial number BPZF973 and asked if ORNELAS could supply M30 fentanyl pills, which ORNELAS said he could.  ORNELAS and CASTRO got back inside their vehicle and left the area.

60.    The CI drove to the pre-determined meeting location, where ATF SAs recovered one Glock, model 48, 9x19mm caliber pistol, bearing serial number BPZF973.

**O.    AUGUST 23, 2023: FAUSTO SELLS ONE FIREARM AND
METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

61.    Based on my review of social media messages, the following occurred:

a.    On August 17, 2023, FAUSTO called CI-1 and told CI-1 that he, V. SANCHEZ, and L. SANCHEZ were recently arrested

for possessing firearms.[13]  FAUSTO said he was out on bail for the arrest but wanted to make money to post bail for V. SANCHEZ and L. SANCHEZ.  FAUSTO sent CI-1 multiple photographs of firearms.  FAUSTO agreed to sell CI-1 a handgun and two ounces of methamphetamine.

      b.    On August 23, 2023, FAUSTO told CI-1 to meet near the W. Monterey Residence.

      62.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

      a.    Upon arrival to the residence, FAUSTO entered CI-1's vehicle and handed CI-1 one Glock, model 19, 9x19mm caliber pistol, with an obliterated serial number with ammunition as well as a bag containing methamphetamine.  FAUSTO showed CI-1 photographs of other firearms he had access to and could sell.

      63.  The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 55.6 grams of methamphetamine and (ii) one Glock, model 19, 9x19mm caliber pistol, with an obliterated serial number. The drug amounts were subsequently confirmed by DEA laboratory testing.

---

      [13] I was present during an August 6, 2023, traffic stop as FAUSTO drove a vehicle with V. SANCHEZ and L. SANCHEZ as passengers.  During the traffic stop, two firearms were recovered from the vehicle and the three were arrested.

P.  **SEPTEMBER 6, 2023: CASTRO AND DOMINGUEZ SELL TWO FIREARMS TO ATF CONFIDENTIAL INFORMANTS; CASTRO SELL COCAINE TO ATF CONFIDENTIAL INFORMANTS; CASTRO AND GORDIAN-PADILLA SELL TWO FIREARMS TO ATF CONFIDENTIAL INFORMANTS**

64.  Based on my review of text messages, the following occurred:

a.  On September 1, 2023, CASTRO sent multiple photographs of firearms via text message to CI-2, offering them for sale.  CI-2 and CASTRO negotiated on prices of firearms as CASTRO continued to send photographs of other firearms for sale. CASTRO agreed to sell three firearms to CI-2 and CI-3[14].

65.  Based on my conversations with the CIs, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.  On September 6, 2023, CASTRO was dropped off by DOMINGUEZ and met with CI-2 and CI-3 at a restaurant in Irwindale, California.  CASTRO told CI-2 and CI-3 that DOMINGUEZ had the firearms and would be returning shortly so CASTRO could sell them.  As they waited, CASTRO showed pictures of firearms he had access to and could sell to the CIs.

b.  Upon DOMINGUEZ's arrival in his Ford Mustang, CASTRO and CI-2 went outside to meet with DOMINGUEZ.  CI-2 paid

---

[14] CI-3 has one previous felony conviction for robbery.  CI-3 began working with ATF in 2012 after initially working for the Los Angeles Police Department.  Since 2012, CI-3 has participated in over 100 ATF investigations in separate judicial districts throughout the United States.  Since CI-3 began to work with ATF, CI-3 has been financially compensated for his/her assistance in these investigations. Agents have found CI-3 to be reliable and credible.

CASTRO for one Rock Island, .45 caliber handgun, bearing serial
number RIA2477435 and one Rock Island, .45 caliber handgun,
bearing serial number RIA2477443 that DOMINGUEZ brought with
him.  CASTRO handed a portion of the money to DOMINGUEZ.

      c.  A short time later, GORDIAN-PADILLA arrived in
his Toyota Corolla and waited in the parking lot.  CASTRO
introduced CI-3 to GORDIAN-PADILLA and CI-3 got in GORDIAN-
PADILLA's vehicle.  GORDIAN-PADILLA sold one Springfield Armory,
model XD, handgun, bearing serial number HD933112 and one Glock,
model 43, handgun, bearing serial number AEXV209 to CI-3.  CI-3
told GORDIAN-PADILLA that he/she was shipping the firearms to
Mexico, to which GORDIAN-PADILLA responded that he would be able
to provide firearms "all day" for CI-3 to sell.  Outside the
vehicle, CASTRO sold CI-2 a small bag of cocaine.  The two CIs
left the location together.

      66.  The CI drove to the pre-determined meeting location,
where ATF SAs recovered: (i) 5.3 grams of a mixture and
substance containing a detectable amount of cocaine; (ii) one
Armscor, Rock Island Armory, model M1911 A1-FS, .45 ACP caliber
pistol, bearing serial number RIA2477435; (iii) one Armscor,
Rock Island Armory, model M1911 A1-FS, .45 ACP caliber pistol,
bearing serial number RIA2477443; (iv) one HS Produkt,
Springfield Armory, model XD9, 9x19mm caliber pistol, bearing
serial number HD933112; and (v) one Glock Model 43, 9x19mm
caliber pistol, bearing serial number AEXV209.

**Q.    SEPTEMBER 7, 2023: SEARCH WARRANT OF CARMONA RESIDENCE**

67.   On September 5, 2023, Honorable Geanene Yriarte of the Los Angeles County Superior Court, East Judicial District authorized the search of 15753 Alwood Street, La Puente, California 91744 (the "Alwood Residence"), both believed to be associated with CARMONA based on prior controlled purchases for firearms conducted at the location.

68.   On September 7, 2023, while executing the search warrant at the Alwood Residence, officers detained CARMONA as he exited the residence.  CARMONA told the officers that he knew why officers were there and that it was because of the firearms in the back of his house.

69.   Located in the detached garage at the Alwood Residence, officers recovered seven firearms, body armor, and approximately 2,689 rounds of mixed caliber ammunition.  Of the seven firearms, one handgun contained an obliterated serial number.  Separately, inside CARMONA's bedroom, officers located and recovered 251 rounds of ammunition from inside his closet and inside a pair of male sized sweatpants.

**R.    OCTOBER 12, 2023: V. SANCHEZ SELLS ONE POUND OF METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

70.   Based on my review of social media messages, the following occurred:

a.   On October 12, 2023, CI-1 asked V. SANCHEZ via Instagram direct message the price for one pound of methamphetamine.  V. SANCHEZ replied, "1250 for 1" and told CI-1 to meet him at 1183 W. Holt Avenue, Pomona, California 91768.

b.    At approximately 2:16 p.m., CI-1 received a call from V. SANCHEZ through Instagram.  V. SANCHEZ directed CI-1 to park along the curb in front of an autobody shop located at 1225 W. Holt Ave., Pomona, California 91768.

71.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.    V. SANCHEZ greeted CI-1 once CI-1 got out of the car.  V. SANCHEZ held a white paper bag and led CI-1 to a red Jeep Wrangler where he opened the rear driver side door and opened the paper bag.  V. SANCHEZ pulled out a plastic container with approximately one pound of methamphetamine inside for which CI-1 paid $1,300.

b.    As CI-1 asked about firearms, V. SANCHEZ said he would put CI-1 in contact with someone who could supply CI-1 with more firearms.

72.  The CI drove to the pre-determined meeting location, where ATF SAs recovered 420.4 grams of methamphetamine.

**S.    NOVEMBER 15, 2023: V. SANCHEZ SELLS ONE FIREARM TO ATF CONFIDENTIAL INFORMANT**

73.  Based on my review of social media messages, the following occurred:

a.    On November 13, 2023, V. SANCHEZ sent CI-1 a direct message on Instagram containing a photograph of multiple firearms and V. SANCHEZ asked if CI-1 was interested in purchasing any of them.  The following day, V. SANCHEZ sent CI-1 numerous photographs of firearms either on a table or in their

gun boxes and said, "All these available," implying he had access to a significant number of firearms to sell.  CI-1 agreed to purchase an AK-style handgun and a handgun from V. SANCHEZ.

     b.   On November 15, 2023, V. SANCHEZ sent CI-1 the address of 1018 W. 3rd St, Pomona as the location to meet.  V. SANCHEZ sent the CI a message reading, "Pull up righ there my boi gonna sell it to u a 45. . . Let me know wen u there's."  As CI-1 drove to the location, V. SANCHEZ called CI-1 through Instagram and asked, "Aye, you see the homie?"  V. SANCHEZ directed CI-1 to a co-conspirator's location where he was standing near a black BMW.  V. SANCHEZ told CI-1 to tell the co-conspirator that he/she was there for "Pollo."

74.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

     a.   Upon meeting with the co-conspirator, he told CI-1, "I have it right here" and motioned towards the BMW.  CI-1 confirmed the price of $1,100 with the co-conspirator as he retrieved a Smith & Wesson, M&P 45, .45 caliber firearm, bearing serial number MRL8328 from the vehicle and sold it to CI-1.

75.  The CI drove to the pre-determined meeting location, where ATF SAs recovered one Tri Town Precision Plastics Smith & Wesson, model M&P 45, .45 caliber pistol, bearing serial number MRL8328.

> **T.   NOVEMBER 20, 2023: V. SANCHEZ, CASTRO, DOMINGUEZ, AND F. RODRIGUEZ SELL TWO FIREARMS TO ATF CONFIDENTIAL INFORMANT**

76.  Based on my review of social media messages, the following occurred:

a.   On November 19, 2023, CI-1 messaged V. SANCHEZ on Instagram and V. SANCHEZ asked if CI-1, "U need a P?" which I know to be slang terminology to be a pound of methamphetamine. CI-1 affirmed and the two agreed to meet the following day to conduct the deal.  A short time later, V. SANCHEZ sent a photograph of an Ak-style rifle to CI-1 and if CI-1 was interested, which CI-1 said he/she would buy it.

b.   A short time later, V. SANCHEZ said the Ak-style rifle had been sold, but he could sell CI-1 a handgun and a fully automatic Ak-style handgun in addition to the pound of methamphetamine.  The CI agreed and the two planned to meet at the Autobody Shop located at 1225 W. Holt Avenue in Pomona (the "Autobody Shop") the following day.

77.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   On November 20, 2023, CI-1 arrived at the Autobody Shop and informed V. SANCHEZ that he/she had arrived. Minutes later, CASTRO and DOMINGUEZ arrived in a Toyota Camry bearing California license plate #8YKY600 that CASTRO was driving.  CI-1 exited his/her vehicle and greeted CASTRO. CASTRO led CI-1 into the Autobody Shop bay where DOMINGUEZ, F. RODRIGUEZ, and another individual, F.M., were inside speaking.

61

CASTRO approached RODRIGUEZ who had a one CAI, Century Arms,
model Draco, 7.62x39mm caliber pistol, bearing serial number
USD000358 sitting on his lap and handed it to CASTRO.  CASTRO
handed the firearm to CI-1 and told him/her that the gun was
fully automatic.  CI-1 asked CASTRO if he brought the Glock that
was offered for sale.  After learning that the Glock was no
longer available, DOMINGUEZ and CASTRO told CI-1 that they had a
different gun for $1,000.

   b.   CASTRO told CI-1, "I got a Ruger" and retrieved a
Ruger handgun box.  CASTRO showed CI-1 one Sturm, Ruger, and
Co., model Security-9, 9mm Luger caliber pistol, bearing serial
number 384-29482 and CI-1 agreed to purchase it.  CASTRO then
made a call to V. SANCHEZ to see how long until the
methamphetamine would arrive.  CI-1 put the firearms inside
his/her vehicle and called V. SANCHEZ to inform him that he/she
purchased two of the guns.  V. SANCHEZ said the methamphetamine
would be delayed and the two agreed to conduct the
methamphetamine deal later.

   78.  The CI drove to the pre-determined meeting location,
where ATF SAs recovered: (i) one CAI, Century Arms, model Draco,
7.62x39mm caliber pistol, bearing serial number USD000358 and
(ii) one Sturm, Ruger, and Co., model Security-9, 9mm Luger
caliber pistol, bearing serial number 384-29482.

   **U.   DECEMBER 6, 2023: CASTRO SELL FIVE FIREARMS TO ATF
        CONFIDENTIAL INFORMANT; CASTRO AND DOMINGUEZ SELL ONE
        POUND OF METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

   79.  Based on my review of text messages and recorded
calls, the following occurred:

a.   On November 20, 2023, CASTRO sent a text to CI-1 with photographs of a firearm he could obtain to sell to CI-1. On November 29, 2023, CASTRO called CI-1 and said he had another Ak-style handgun to sell, as well as a pound of methamphetamine. CASTRO proceeded to send CI-1 photographs and a video of himself holding different firearms, showing them to CI-1, advertising them for sale.

b.   On December 1, 2023, CASTRO sent CI-1 two photographs via text message of what appeared to be two different Glock .40 caliber handguns.  CASTRO told CI-1 that the prices would be $1,100 for the first and $1,200 for the second one.  CASTRO called the CI shortly after and told CI-1 he "had a lot of them" after the CI asked if he could hold on to them for him/her.  CASTRO sent an additional video of a different handgun.  CI-1 and CASTRO agreed to meet at the Autobody Shop to do the deal.

c.   On December 6, 2023, CASTRO called and asked when CI-1 would arrive to the location.  CASTRO told the CI that V. SANCHEZ had the methamphetamine and would be arriving shortly.

80.   Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   On December 6, 2023, upon arriving at the Autobody Shop, CI-1 exited his/her vehicle and met with CASTRO. CASTRO led CI-1 inside the bay and retrieved a black trash bag from beneath the desk.  CASTRO showed the CI the handguns from inside the bag and provided prices for each one.  The two

negotiated the price and CASTRO agreed to sell five handguns for $6,300. CI-1 paid CASTRO who counted the money on the desk.

    b.    CASTRO asked CI-1 if he could ride with CI-1 to go pick up the methamphetamine, as its, "right down the street." CASTRO directed CI-1 to a residence on East Pasadena Street in Pomona, California and said the pound would cost $1,400. As CI-1 and CASTRO arrived, they parked next to DOMINGUEZ's Ford Mustang. DOMINGUEZ exited from the driver seat of the Mustang and met with CASTRO. A co-conspirator approached CASTRO and DOMINGUEZ while speaking on the phone. DOMINGUEZ greeted CI-1 and apologized for the delay. CASTRO told CI-1 that the co-conspirator was getting the methamphetamine from the car. As CI-1 counted the money for the methamphetamine, DOMINGUEZ and CISNEROS can be seen in the driver side mirror returning from the silver Toyota Camry parked in front of DOMINGUEZ's Mustang. DOMINGUEZ handed a black backpack containing the methamphetamine and gave it to CI-1.

    81.    The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 445.5 grams of methamphetamine; (ii) one Armscor, Rock Island Armory, model M1911 A1-FS, .45 ACP caliber pistol, bearing serial number RIA2477435; (iii) one Armscor, Rock Island Armory, model M1911 A1-FS, .45 ACP caliber pistol, bearing serial number RIA2477443; (iv) HS Produkt, Springfield Armory, model XD9, 9x19mm caliber pistol, bearing serial number HD933112; (v) one Glock, model 43, 9x19mm caliber pistol, bearing serial number AEXV209; and (vi) one Smith and Wesson, model SD 40VE, .40 caliber handgun, bearing serial

number HEY9822.  The drug amounts were subsequently confirmed by
DEA laboratory testing.

**V.    JANUARY 11, 2024: V. SANCHEZ, L. SANCHEZ, AND F.
RODRIGUEZ SELL TWO FIREARMS AND ONE POUND OF
METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

82.  Based on my review of social media and text messages,
the following occurred:

a.    On January 3, 2024, V. SANCHEZ sent an Instagram
direct message to CI-1 offering two AR-style rifles for sale.
CI-1 asked for a price, and V. SANCHEZ said it would be $1,500
for each rifle.  V. SANCHEZ then made an audio call via
Instagram and asked if CI-1 was interested.  CI-1 said he/she
was if V. SANCHEZ could hold onto the firearms for a couple
days.  This call was not recorded, and I was not present.  CI-1
later told me that CI-1 recognized V. SANCHEZ's voice on the
call.

b.    On January 5, 2024, V. SANCHEZ sent CI-1 a
photograph via Instagram of what appeared to be a Springfield XD
firearm.

c.    On January 7, 2024, V. SANCHEZ sent CI-1 another
photograph via Instagram of what appeared to be a rifle and told
CI-1 that it was $1,600. CI-1 asked if V. SANCHEZ could hold
onto the firearms until January 11. V. SANCHEZ agreed. V.
SANCHEZ provided his phone number ending in -5057.

d.    On January 10, 2024, CI-1 sent a text message to
the -5057 Number asking V. SANCHEZ if he could sell CI-1 one
pound of methamphetamine.  V. SANCHEZ agreed and confirmed a

meeting the following day to sell the firearms and pound of methamphetamine.

e.   On January 11, 2024, V. SANCHEZ sent a text message -5057 number to CI-1 telling him/her to meet at the Autobody Shop.  V. SANCHEZ texted CI-1, "I'm already in Pomona I got everything already."

83.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   Before CI-1 arrived, surveillance units saw L. SANCHEZ and F. RODRIGUEZ standing outside the Autobody Shop talking to one another.  At approximately 12:38 p.m., CI-1 pulled into the parking lot.  L. SANCHEZ pointed to a nearby Chevrolet Tahoe bearing California license plate ending in -V332 (the "Tahoe") and said, "I got all the shit in there."  After utilizing law enforcement resources, I learned that the Tahoe was registered to M.S., who I believe is related to V. SANCHEZ and L. SANCHEZ based on their shared family name and residence.

b.   At approximately 12:40 p.m., L. SANCHEZ and F. RODRIGUEZ placed two large objects wrapped in jackets in CI-1's in the backseat of CI-1's vehicle.  These objects contained a Smith & Wesson M&P-15 rifle bearing serial number SV12747, a one privately manufactured AR-style rifle, bearing no serial number (commonly referred to as a "ghost gun"), and 450.4 grams of methamphetamine.  CI-1 asked L. SANCHEZ for the total price for all three items, as L. SANCHEZ called V. SANCHEZ and spoke to him on speakerphone.  While on speakerphone, L. SANCHEZ said,

66

"Chicken,[15] how much again in total?"  The person on the other end of the phone, V. SANCHEZ,[16] told L. SANCHEZ that the two rifles were $1,600 and the pound of methamphetamine was $1,200. CI-1 paid L. SANCHEZ $2,800.

84.  The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 450.4 grams of methamphetamine; (ii) one LW Schneider Inc., Smith & Wesson, model M&P 15, 5.56 NATO caliber rifle, bearing serial number SV12747; and (iii) one privately manufactured AR-style rifle, bearing no serial number (commonly referred to as a "ghost gun"). The drug amounts were subsequently confirmed by DEA laboratory testing.

**W.  FEBRUARY 13, 2024: V. SANCHEZ AND L. SANCHEZ SELL TWO FIREARMS AND TWO POUNDS OF METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

85.  Based on my review of text messages and recorded calls, the following occurred:

a.  On February 8, 2024, at approximately 12:38 p.m., CI-1 called V. SANCHEZ on a recorded phone call.  During the phone call, I listened to and recognized the voice of V. SANCHEZ, who said he had two handguns of his own that he would be willing to sell to CI-1.  V. SANCHEZ told CI-1 on the recorded call, "I have two of my own right here. They're just like little ones though . . . . A Kel-Tec 380 and a Ruger 9,"

---

[15] I believe "chicken" is another alias for "pollo," in part because of the context of the conversation, and in part because "chicken" is the English translation of "pollo."

[16] CI-1 told me that he/she recognized V. SANCHEZ's voice from the speakerphone, I reviewed the video/audio recording and confirmed that the voice on the other end of the speaker phone was consistent with my prior experience listening to V. SANCHEZ.

which I know are makes and models of handguns.  V. SANCHEZ then asked CI-1, "About the other things, you just want one?" which I know based on prior conversations between the two and experience, that V. SANCHEZ is referencing pounds of methamphetamine to sell to CI-1.

b.    While still speaking with V. SANCHEZ, CI-1 asked about a Walmart fraud scheme that V. SANCHEZ posted on Instagram and how it worked.  V. SANCHEZ said to CI-1, "It was like through like some gift cards. I don't know. My mom and them were doing it. I was getting the custies [customers]."  V. SANCHEZ said the scheme worked by using fraudulent gift cards to place the Walmart orders and the third-party person would only have to pay V. SANCHEZ for half the total amount of what it would have cost, telling CI-1, "Whatever you order, you know, half of that."  V. SANCHEZ said the scheme just ended that day, but he would let CI-1 know if they started up again.

c.    Minutes after they hung up, V. SANCHEZ sent two pictures via text message to CI-1 of a Ruger and a Keltec handgun, followed by, "1k for tiger n $900 for 380."  Based on my experience and the context of the communications, I believe that V. SANCHEZ was telling CI-1 the price of the Ruger 9mm handgun was $1,000 and the Keltec .380 handgun was $900.  V. SANCHEZ confirmed they would meet on February 13, 2024, to sell CI-1 two handguns and two pounds of methamphetamine.

d.    On February 10, 2024, CI-1 sent a text message to V. SANCHEZ asking, "And can you get me two pounds?" to which V. SANCHEZ replied, "Yeah."

68

e.    On February 12, 2024, at approximately 11:09 a.m., V. SANCHEZ texted CI-1 to confirm the transaction.  CI-1 and V. Sanchez confirmed that they were meeting at the Autobody Shop.

86.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.    On February 13, 2024, at approximately 12:05 p.m., CI-1 arrived at the Autobody Shop where L. SANCHEZ was sitting in a Chevrolet Tahoe with another individual.

b.    As CI-1 parked, L. SANCHEZ got out of his car and into CI-1's car.  L. SANCHEZ handed CI-1 a grey plastic bag and showed CI-1 two pounds of methamphetamine and two handguns.  CI-1 told L. SANCHEZ that CI-1 intended to put a "switch" on one of the guns.  Based on my training and experience, and the context of the conversation, I know that "switches" are slang for machinegun conversion devices that effectively attach onto a firearm and allow the gun to shoot fully automatic.  L. SANCHEZ said he could get CI-1 Glock switches later if CI-1 was interested.  CI-1 paid L. SANCHEZ $4,300 for one Sturm, Ruger, and Co., model EC9s, 9mm Luger caliber pistol, with an obliterated serial number, one Kel-Tec CNC, model P3AT, .380 Auto caliber pistol, bearing serial number H9X21, and 855.8 grams of methamphetamine.

87.  The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 855.8 grams of methamphetamine; (ii) one Sturm, Ruger, and Co., model EC9s, 9mm Luger caliber

pistol, with an obliterated serial number ; and (iii) one Kel-Tec CNC, model P3AT, .380 Auto caliber pistol, bearing serial number H9X21.

### X. FEBRUARY 13, 2024: GORDIAN-PADILLA SELLS ONE FIREARM TO ATF CONFIDENTIAL INFORMANT

88. Based on my review of social media messages, the following occurred:

   a.   On February 12, 2024, GORDIAN-PADILLA posted three Instagram Stories on his account advertising the sale of different handguns.  One of the photographs contained the caption, "First come first serve."  On the same date, CI-5[17] sent GORDIAN-PADILLA a direct message asking for the prices of the posted firearms.  GORDIAN-PADILLA replied that they were $850 and $950.  GORDIAN-PADILLA agreed to sell one of the Ruger handguns to CI-5 on the following day.

   b.   On February 13, 2024, GORDIAN-PADILLA sent CI-5 an address of 565 W. Arrow Highway, San Dimas, as a location to meet to conduct the deal.

89. Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

   a.   Following the CI-5's arrival at the W. Arrow Highway location, GORDIAN-PADILLA arrived in a Toyota Corolla bearing California license plate 8MXE785.  CI-5 entered the

---

[17] CI-5 began working for ATF in 2019.  The CI received one felony conviction in 2013 for evading a peace officer.  The CI has cooperated for financial benefit and has assisted numerous ATF investigations.  Agents have found CI-5 to be reliable and credible .

passenger seat of GORDIAN-PADILLA's vehicle.  While discussing the firearms, GORDIAN-PADILLA stated, "I be getting them often, you know, so. It's good business, you know, on my end." GORDIAN-PADILLA sold one Sturm, Ruger, and Co., model SR40, .40 caliber pistol, bearing serial number 344-02933 to CI-5 for $1,000 and CI-5 returned to his/her vehicle.

90.  The CI drove to the pre-determined meeting location, where ATF SAs recovered one Sturm, Ruger, and Co., model SR40, .40 caliber pistol, bearing serial number 344-02933.

**Y.   FEBRUARY 28, 2024: V. SANCHEZ AND L. SANCHEZ SELL TWO FIREARMS, INCLUDING ONE SHORT-BARRELED RIFLE AND ONE POUND OF METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

91.  Based on my review of text messages and recorded calls, the following occurred:

a.   On February 26, 2024, at approximately 12:30 p.m., V. SANCHEZ sent a text message to CI-1.  Included in the recorded texts, were two photographs of what appeared to be rifles on the ground.  CI-1 asked over text message for the price of each, which V. SANCHEZ replied $1,900.  V. SANCHEZ then texted CI-1, "The homie has a Glock 30 .45 with stick n switch for $2100."  Based on my training and experience with this investigation, and the context of the conversation, I know that a "stick" is slang for a high-capacity magazine.

b.   CI-1 said he/she would buy all three firearms from V. SANCHEZ on February 28, 2024.  V. SANCHEZ replied via text, "Fosho just the toys ?. . . Or sun work too?"  Based on my training and experience in this investigation, I believe this was V. SANCHEZ asking CI-1 in slang if he just wanted guns or if

he also wanted drugs. CI-1 told V. SANCHEZ that CI-1 would purchase one pound of methamphetamine and V. SANCHEZ agreed.

    c.   On February 27, 2024, at approximately 7:24 p.m., V. SANCHEZ called CI-1 in a recorded call and said, "I was trying to tell you cause lowkey the homie had the little thing with the fucking switch. That fools fucking not even responding to me." V. SANCHEZ said he already had the other two rifles but would still try to get the Glock. The two confirmed their meeting the following day.

    92.  Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

    a.   On February 28, 2024, CI-1 met with L. SANCHEZ at the Autobody Shop. L. SANCHEZ placed one Arsenal, model SLR95, 7.62 mm caliber rifle, bearing serial number KO372089, one privately manufactured short-barreled rifle bearing no serial number (commonly referred to as a "ghost gun"), and 431.1 grams of methamphetamine into CI-1's vehicle. L. SANCHEZ said he could get more methamphetamine later if CI-1 wanted.

    93.  The CI drove to the pre-determined meeting location, where ATF SAs recovered: (i) 431.1 grams of methamphetamine; (ii) one Arsenal JSCo, Arsenal, model SLR95, 7.62x39 caliber rifle, bearing serial number KO372089; and (iii) one privately manufactured short-barreled rifle[18] bearing no serial number (commonly referred to as a "ghost gun").

---

[18] ATF has determined the barrel length is less than 16 inches in length.

**Z.    FEBRUARY 28, 2024: GORDIAN-PADILLA SELLS ONE FIREARM
ATF CONFIDENTIAL INFORMANT**

94.  Based on my review of social media messages, the
following occurred:

a.    On February 21, 2024, GORDIAN-PADILLA posted an
Instagram Story on his Instagram account of what appeared to a
pistol inside a blue gun box.  CI-5 sent a direct message asking
for the price of the firearm, to which GORDIAN-PADILLA
responded, "($)900."  On February 26, 2024, CI-5 asked if
GORDIAN-PADILLA still had the firearm to which he said he did.
GORDIAN-PADILLA agreed to sell the firearm to CI-5 and sent the
same address as the previous deal of 565 West Arrow Highway, San
Dimas.

95.  Based on my conversations with the CI, and my review
of the video/audio recording and law enforcement reports, the
following occurred:

a.    On February 28, 2024, CI-5 met with GORDIAN-
PADILLA who arrived in his Toyota Corolla, bearing California
license plate 8MXE785.  CI-5 entered GORDIAN-PADILLA's vehicle
to do the deal.  CI-5 asked if GORDIAN-PADILLA could get Glock
handguns to sell, to which GORDIAN-PADILLA replied, "Yeah. I can
get brand new shit.  I can get everything . . . I had a person
that was, he was printing fucking switches but . . . he got
busted."  I know based on training and experience that
"switches" are machinegun conversion devices that allow a semi-
automatic firearm to function fully automatic once installed.

     b.   GORDIAN-PADILLA sold one Sarsilmaz (Sar Arms), model SARB6P, 9mm caliber pistol, bearing serial number T1102-12E00338, to CI-5 for $900.  GORDIAN-PADILLA removed a second firearm from his waistband and showed it to CI-5.

96.   The CI drove to the pre-determined meeting location, where ATF SAs recovered one Sarsilmaz (Sar Arms), model SARB6P, 9mm caliber pistol, bearing serial number T1102-12E00338.

**AA.  APRIL 10, 2024: V. SANCHEZ AND L. SANCHEZ SELL TWO POUNDS OF METHAMPHETAMINE TO ATF CONFIDENTIAL INFORMANT**

97.   Based on my review of text messages, the following occurred:

     a.   On April 8, 2024, at approximately 4:13 p.m., CI-1 sent a text message to V. SANCHEZ asking what V. SANCHEZ had available.  V. SANCHEZ replied, "What u need" and CI-1 responded, "Toys and 2ps."  Based on my training and experience, and experience in this investigation, I know that "toys" is coded language for firearms and "2ps" is often coded language for two pounds.  This exchange appeared to be CI-1 ordering guns and 2 pounds of methamphetamine.  V. SANCHEZ said he would see what he could get and texted CI-1 saying, "Ima be changing my number to."

     b.   Approximately one hour later, V. SANCHEZ texted CI-1 a series of eight photographs containing 15 different firearms.  V. SANCHEZ asked, "Wat u wanna get . . . So I could have em save em."  The two texted back and forth and agreed on the sale of six firearms and two pounds of methamphetamine for April 10, 2024, in a parking lot in West Covina, California.

98.   Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   On April 10, 2024, CI-1 met with L. SANCHEZ at a parking lot in West Covina, California.  L. SANCHEZ entered CI-1's vehicle and handed him/her two pounds of methamphetamine. L. SANCHEZ said that the guns were down the street and that he had to go pick them up, but asked CI-1 to wait since the dealer only would meet with him.  CI-1 paid L. SANCHEZ $4,000 for the methamphetamine while L. SANCHEZ left to retrieve the guns.

b.   After some time passed, CI-1 texted V. SANCHEZ multiple times to ask when L. SANCHEZ would return with the guns but received no response.  CI-1 called V. SANCHEZ twice, but the calls were unanswered.  L. SANCHEZ never returned.

99.   The CI drove to the pre-determined meeting location, where ATF SAs recovered 439.4 grams of methamphetamine.

**BB.   SEPTEMBER 16, 2024: V. SANCHEZ AND MOTAMEDI SELL 1,000 CARFENTANIL PILLS TO AN ATF CONFIDENTIAL INFORMANT AND ATF UNDERCOVER AGENT**

100. Based on my review of social media messages and recorded calls, the following occurred:

a.   On September 15, 2024, CI-4[19] called V. SANCHEZ and asked if V. SANCHEZ could sell him/her 100 M30 fentanyl

---

[19] CI-4 has been an ATF CI since approximately September 2024.  CI-4 received a felony conviction for burglary in 2017.  CI-4 has stated they are no longer affiliated with any gang and the information he/she has provided has been corroborated.  CI-4 has been found to be honest and truthful.  CI-4 works for financial consideration from ATF.

pills.  V. SANCHEZ replied, "Yeah, it's easy. I get jars all day.  I get boats.  All that shit."  I know from training and experience that "jars" are coded language for 100 pills and "boats" means 1,000 pills.

  b. On September 16, 2024, CI-4 sent V. SANCHEZ a message on Instagram stating, "Ayy pops u can get me a (boat emoji)? And how much if u can?" V. SANCHEZ replied, "Yea n $800." V. SANCHEZ sent CI-4 an audio message and stated he would set up CI-4 with a "homie" who was coming from Orange County.  V. SANCHEZ then sent another audio message and stated, "My homie said if you go to OC, he'll knock off 50 bucks.  Let me know."  CI-4 agreed and asked V. SANCHEZ for the address.  V. SANCHEZ sent the CI the following address: 3911 S Bristol Street, Santa Ana, a CVS drugstore parking lot.

 101. Based on my conversations with the CI, members of law enforcement, and my review of the video/audio recording and law enforcement reports, the following occurred:

  a. At approximately 8:00 p.m., an ATF undercover agent ("UC") and CI-4 arrived at the parking lot meeting location.  Minutes later, MOTAMEDI arrived driving a Mercedez Benz bearing CA license plate 9KBH699.  UC and CI-4 greeted MOTAMEDI and verified the price for the 1,000 pills would be $750, which MOTAMEDI confirmed.  MOTAMEDI said, "I usually don't do singles you know you feel me but . . . ."  UC asked if MOTAMEDI could supply 10,000 pills, which MOTAMEDI replied, "yeah, depends on what you trying to pay let's be realistic."

b.    UC asked if MOTAMEDI had methamphetamine for sale which MOTAMEDI said he did.  MOTAMEDI asked UC, "what are you trying to pay for the water?" which, based on my training and experience, I know to be coded language for methamphetamine. MOTAMEDI told UC, "if you grab 10 (pounds) I can do you at seven-hundred, all shards."  UC said he/she was mainly interested in purchasing M30 pills and methamphetamine which MOTAMEDI replied, "that my thing, the water (methamphetamine) yeah all day."

102. The CI drove to the pre-determined meeting location, where ATF SAs recovered 106.07 grams of a mixture and substance containing a detectable amount of carfentanil, a fentanyl analogue. The drug amounts were subsequently confirmed by DEA laboratory testing.

**CC.  SEPTEMBER 18, 2024: LAW ENFORCEMENT SERVE SEARCH WARRANT AT J. AND E. RODRIGUEZ APARTMENT AND RECOVER DRUGS AND FIREARMS. LOPEZ IS IDENTIFIED AS SUPPLYING J. AND E. RODRIGUEZ WITH M30 PILLS**

103. Based on my review of text messages and recorded calls, the following occurred:

a.    During live interception of V. SANCHEZ's cellphone, agents intercepted communications between V. SANCHEZ and J. RODRIGUEZ using phone number ending in -6956.

b.    On September 1, 2024, at approximately 9:23 a.m., J. RODRIGUEZ sent a text message reading, "On the line for the moment both AR15," indicating he was working on acquiring multiple AR-15 style rifles.

c.   On September 2, 2024, at approximately 4:28 p.m., J. RODRIGUEZ called V. SANCHEZ after missing a few calls from V. SANCHEZ earlier in the day.  V. SANCHEZ asked if J. RODRIGUEZ had that "full thing still," to which J. RODRIGUEZ replied, "It's not full, it's almost."  J. RODRIGUEZ said he only had 800-900 pills left.  J. RODRIGUEZ asked if V. SANCHEZ would want to go pick up the pills, saying, "They're right there at the pad fool, they're yours . . . Let me know when you're ready."

d.   In following text messages, V. SANCHEZ asked what time he could pick up the pills from J. RODRIGUEZ's house, to which J. RODRIGUEZ replied: "It's gonna be you picking them up right?... I trust you to go to my pad carnal... Especially me not been there feel me."  V. SANCHEZ confirmed and J. RODRIGUEZ text him: "Just give me a time so I can set it up and have that ready for you… My wife[20] is with family so later is better so your good."  J. RODRIGUEZ then sent his address of "1900 Argyle ave San Bernardino ca 92404" (the "Argyle Residence") as V. SANCHEZ said he would arrive around 10 p.m.

e.   At approximately 9:58 p.m., V. SANCHEZ called J. RODRIGUEZ to let his wife know V. SANCHEZ was arriving, which J. RODRIGUEZ acknowledged and told V. SANCHEZ to go to the door. Surveillance units positioned around the Argyle Residence observed V. SANCHEZ exit from his vehicle and meet with a female at the front door briefly before walking back to his car.

104. On September 12, 2024, the Honorable Janet Frangie of the Superior Court, San Bernardino Judicial District issued a

---

[20] E. RODRIGUEZ is J. RODRIGUEZ's wife.

search warrant for the Argyle Residence.  On September 18, 2024, law enforcement executed the search warrant.  During the execution of the warrant, E. RODRIGUEZ was detained and informed officers that J. RODRIGUEZ was in Mammoth, California for work. E. RODRIGUEZ and J. RODRIGUEZ were the only two adults that lived in the location.

105. During a search of the residence, officers located a Smith and Wesson, model M&P Shield, 9mm caliber handgun, bearing serial number HXN5237 on the nightstand next to E. RODRIGUEZ and J. RODRIGUEZ's bed.  Next to the Smith and Wesson handgun was a black nylon bag which contained two zip-lock bags of approximately 2,000 M30 pills, a small plastic bag which appeared to contain cocaine, hundreds of small plastic baggies commonly used for packaging and separating drugs into smaller sales sized amounts, a digital scale, and U.S. currency in multiple denominations.  Inside the nearby bedroom closet, officers located a Derya Arms, model VR-60, 12-gauge shotgun, bearing serial number R115632 loaded with five rounds of 12-guage ammunition.

106. Following the search warrant, E. RODRIGUEZ was not placed under arrest and said she wished to discuss the circumstances to what led officers to the search warrant.  In a post-*Miranda* interview, E. RODRIGUEZ said that J. RODRIGUEZ periodically traveled away for work and while he was away, J. RODRIGUEZ would call E. RODRIGUEZ to let her know that customers would be coming to the house to purchase drugs.  E. RODRIGUEZ said sometimes she knew who the people were and other times they

were random people, but that J. RODRIGUEZ would facilitate the
deal and have his wife separate the drugs, bag them in their
respective amounts, and sell them from the house.  E. RODRIGUEZ
said she thought there were three firearms in the house, despite
officers only locating two.  She described the third one as an
AK-style handgun but said that J. RODRIGUEZ sold them
frequently, so he possibly already sold the missing firearm.
She said that she and J. RODRIGUEZ shared the bedroom together
where the firearms and drugs were located.

107. E. RODRIGUEZ said she didn't know where J. RODRIGUEZ
got the drugs or guns from, but on two occasions while he was
out of town, E. RODRIGUEZ was tasked with picking drugs up from
one of J. RODRIGUEZ's sources.  On the first occasion, E.
RODRIGUEZ was instructed to go to the WinCo grocery store in
Pomona where she would meet the supplier in the parking lot.  E.
RODRIGUEZ was not given the supplier's contact information or
name, just where to be and that her husband would coordinate the
rest.  E. RODRIGUEZ stated the supplier arrived in a Tesla SUV
and described him as a male Hispanic in his mid-twenties.  E.
RODRIGUEZ did not know how many M30 fentanyl pills she was
given, but said it was in the thousands.

108. On September 12, 2024, J. RODRIGUEZ instructed E.
RODRIGUEZ to go to 21411 Chirping Sparrow Rd, Diamond Bar, CA
91765[21] where she would meet with the same man as before and pick
up more M30 pills.  Upon her arrival, E. RODRIGUEZ said she saw

---

[21] I know from this investigation that one of LOPEZ's
associated residences is 21380 Chirping Sparrow Road, Diamond
Bar.

the supplier exit from the house across the street, describing the house as being painted white with a teal trim along the house with an old red truck was parked in the driveway.  E. RODRIGUEZ stated that the same man from the WinCo met her at her car and gave her a bag containing more M30 pills.  She did not know how much was in the bag but thought it was in the thousands again.  E. RODRIGUEZ said the pills officers found in her and J. RODRIGUEZ's bedroom were from the September 12 pickup.

109. Based on my review of V. SANCHEZ's intercepted communications I know that on August 27, 2024, V. SANCHEZ provided LOPEZ's phone number to J. RODRIGUEZ.

110. On September 6, 2024, the Honorable Jean Rosenbluth, Magistrate Judge in the Central District of California authorized the use of a Pen Register and Trap and Trace device installed on LOPEZ's -5936 number.

111. Based on my review of the Pen Register and Trap and Trace on LOPEZ's phone, I observed numerous phone calls and text messages between J. RODRIGUEZ and LOPEZ on and around the date E. RODRIGUEZ said she picked up drugs.

112. A DEA laboratory analysis of the pills showed a net weight of 230 grams of a mixture and substance containing a detectable amount of fentanyl.

113. A DEA laboratory analysis of the cocaine showed a net weight of 2.9 grams of a mixture and substance containing a detectable amount of cocaine.

DD.  **NOVEMBER 4, 2024: V. SANCHEZ AND MOTAMEDI SELL 10,000 M30 PILLS CONTAINING NO FENTANYL TO AN ATF CONFIDENTIAL INFORMANT. V. SANCHEZ SELLS A FIREARM TO AN ATF CONFIDENTIAL INFORMANT**

114. On November 1, 2024, CI-4 sent a text message to V. SANCHEZ asking to purchase 10,000 M30 pills again, to which V. SANCHEZ responded, "Fasho."  The following day, V. SANCHEZ sent a text message confirming to do the deal on November 4, as CI-4 asked if V. SANCHEZ could get him/her a "toy," which, based on my training and experience, I know to be coded language for a firearm.  On November 3, 2024, V. SANCHEZ confirmed he had a firearm to sell and that CI-4 could pick up the gun when he/she came the following day to pick up the M30 pills.

115. On November 4, 2024, V. SANCHEZ sent a text message to CI-4 with the address of 1162 West 17th St, San Bernardino, California 92411 to meet at to purchase the M30 pills.  Later that day, MOTAMEDI met with CI-4 at the location and sold approximately 10,000 blue pills to CI-4

116. As CI-4 counted out the money to pay MOTAMEDI, MOTAMEDI told CI-4, "These are even a little stronger.  Which is nobody is wanting to drop niggas."  Once the deal was complete, MOTAMEDI told the CI, "Let me know bro, just let him (V. SANCHEZ) know and I got you whenever.  Good business."

117. MOTAMEDI exited CI-4's vehicle and got back inside his Mercedes as V. SANCHEZ had a Facetime call with the CI.  V. SANCHEZ directed CI-4 back to 3700 Mountain Ave, San Bernardino, California and had CI-4 park at the residence.  V. SANCHEZ told CI-4, "alright my sister is taking it out right now."  CI-4 paid

M.S., who approached the CI's driver side window.  M.S. handed CI-4 a black bag containing an HS Produkt, model XD9, 9mm handgun, bearing serial number US802577, and 10 rounds of CCI 9mm ammunition and thanked CI-4.

118. A DEA laboratory analysis of the pills showed a net weight of 1,083 grams of Bis Sebacate, which is often mixed with fentanyl but is not itself a controlled substance.

119. The CI drove to the pre-determined meeting location, where ATF SAs recovered one HS Produkt, model XD9, 9mm handgun, bearing serial number US802577, and 10 rounds of CCI 9mm ammunition.

### EE.  NOVEMBER 5, 2024: LAW ENFORCEMENT SERVES A SEARCH WARRANT AT A RESIDENCE USED TO STORE GUNS AND DRUGS BY MEMBERS OF PUENTE-13

120. On October 31, 2024, the Honorable David C. Brougham, Judge of the Superior Court of California, County of Los Angeles, West Covina Courthouse, authorized a search warrant for 1125 Charlemont Avenue, Hacienda Heights, California.  Officers with the West Covina Police Department served the search warrant with the assistance of the ATF, CPD, and LASD.

121. Upon executing the search warrant, the occupants of the converted, detached garage, refused to exit and comply with law enforcement.  Eventually, multiple individuals including ESTRADA-FROST exited from the garage living space and law enforcement searched the residence.

122. In a nightstand drawer in the detached garage, law enforcement found a California ID card and a Social Security card for ESTRADA-FROST.  Additionally, law enforcement found a

tax document inside an armoire addressed to ESTRADA-FROST at 1125 Charlemont Avenue, as well as male clothing that appeared to be of the same size that ESTRADA-FROST wore.  Based, in part on the presence of these documents, I believed that ESTRADA-FROST permanently resided in the detached garage at the time of the search warrant execution.

123. Located inside ESTRADA-FROST's room, investigators found an elevated built-in storage area where three firearms were hidden.  From the storage area, law enforcement recovered: (i) a privately manufactured AR-style handgun, bearing no serial number (commonly referred to as a "ghost gun"); (ii) one 30-round magazine that contained 29 rounds of Lake City .223 caliber ammunition; (iii) one Glock, model[22] 19, 9mm caliber handgun bearing serial number CBNH325 with an extended 31-round magazine and attached laser with light; (iv) inside the magazine were 30 rounds of live 9mm ammunition; (v) one privately manufactured .40 caliber handgun with Smith & Wesson slide, and frame bearing no serial number loaded with (vi) six rounds of .40 caliber ammunition.

124. Located directly next to where the firearms were recovered was a multi-colored Louis Vuitton bag.  In the bag there were three clear plastic baggies containing white powdered substance resembling cocaine, two clear plastic bags containing blue M30 fentanyl pills, and multiple clear, plastic baggies, which appeared to be used for packaging narcotics.

---

[22] The Glock handgun was reported stolen out of San Bernardino.

125. Throughout this investigation, I have routinely viewed numerous Instagram accounts believed to be associated with members of Puente-13, including ESTRADA-FROST.  One of the Instagram profiles is "isaacfromlp_" which I believe belongs to ESTRADA-FROST, based on the name similarities and the photographs/videos posted on the account depicting ESTRADA-FROST.  While viewing the Instagram account "isaacfromlp_," I saw numerous posts and Live Stories depicting ESTRADA-FROST and a suspected Puente-13 member, G.C., holding firearms and posting narcotics for sale, specifically cocaine and M30 pills.  In one such picture posted to the account, ESTRADA-FROST is holding an AR-style handgun with an attached light and no rear stock, matching AR-style ghost gun recovered during the search warrant execution.  Slung across his chest is the uniquely multi-colored Louis Vuitton bag that contained the multiple bags of drugs also recovered during the search warrant execution.  Standing beside ESTRADA-FROST is G.C., holding a handgun with a laser attached, emitting a green light.  A handgun appearing to match the one in the photograph was recovered Isaac ESTRADA-FROST's room that also had a green laser light attached.

126. A DEA laboratory analysis of one bag of the M30 pills showed a net weight of 99 grams of a mixture and substance containing a detectable amount of carfentanil.

127.  A DEA laboratory analysis of the second bag of M30 pills showed a net weight of 11 grams of a mixture and substance containing a detectable amount of fentanyl.

128. A DEA laboratory analysis of white powdered substance showed a net weight of 76 grams of a mixture and substance containing a detectable amount of cocaine.

129. The drug amounts were subsequently confirmed by DEA laboratory testing.

**FF.   DECEMBER 10, 2024: V. SANCHEZ SELLS 500 FENTANYL PILLS TO ATF CONFIDENTIAL INFORMANT**

130. Based on my review of text messages, the following occurred:

a.   On December 5, 2024, CI-4 sent a text message to V. SANCHEZ telling V. SANCHEZ that the last batch of M30 pills he/she purchased from V. SANCHEZ and MOTAMEDI were poor quality.[23]  V. SANCHEZ replied, "Let me talk to the homie pops bc we gotta keep this going."

b.   On December 9, 2024, CI-4 told V. SANCHEZ that he/she needed "a boat" for the following day before he/she purchased more.  I know that "a boat" is slang for 1,000 pills. V. SANCHEZ replied, "Fosho pop… Boats be more expensive tho." The two agreed to meet in Pomona and V. SANCHEZ said the price for the 1,000 pills would be $800.

c.   As the two discussed when and where to meet, V. SANCHEZ sent a text reading, "Fuck hold up my boi probably not gonna be around . . . . Probably won't be around till like 3. Or so."  V. SANCHEZ called and told CI-4 that MOTAMEDI was in San Diego and wouldn't be back until the afternoon.  However, V.

---

[23] The DEA Chemical Analysis of the 10,342 M30 pills purchased on November 4, 2024, from V. SANCHEZ and MOTAMEDI revealed no fentanyl or carfentanil contained in the pills.

SANCHEZ said that the people he was with had "half a boat" (500 pills) on them and that it was "that good shit." A male could be heard on V. SANCHEZ's line telling V. SANCHEZ he had a full boat as well. V. SANCHEZ said he and the guy he was with were going to count and see how many pills they had and would call CI-4 back.

       d.    A short time later, V. SANCHEZ sent the price of $500 for the 500 M30 pills. CI-4 agreed, and V. SANCHEZ sent the address of 776 Laurel Ave, Pomona, California.

131. Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

       a.    V. SANCHEZ made a Facetime call with CI-4 to direct CI-4 to the correct driveway. As the CI pulled into the driveway, V. SANCHEZ approached the vehicle while FAUSTO stood nearby. V. SANCHEZ sold CI-4 the M30 pills for $500 at the driveway and CI-5 departed from the area.

132. The CI drove to the pre-determined meeting location, where ATF SAs recovered 50.6 grams of a mixture and substance containing a detectable amount of fentanyl.

    **GG.    JANUARY 2, 2025: V. SANCHEZ AND FAUSTO SELL 1,000 FENTANYL PILLS TO AN ATF CONFIDENTIAL INFORMANT**

133. Based on my review of text messages, the following occurred:

       a.    On December 30, 2025, CI-4 sent a text message to V. SANCHEZ asking to purchase a "boat" of M30 pills in the

coming days.  The two agreed to meeting on January 2, 2025, to conduct the deal.

b.   On January 2, 2025, prior to the deal, CI-4 sent a text message to V. SANCHEZ asking if the pills were, "fire shit right pops?" to which V. SANCHEZ responded, "Yea," confirming that the M30 pills were of high quality.  V. SANCHEZ sent a text reading, "Same addy as last time . . .781 laurel ave Pomona."  I know from previous deals that this address is associated to FAUSTO and that 781 Laurel Ave, Pomona, California, is within approximately one thousand feet of the Roosevelt Elementary School located at 701 N. Huntington St, Pomona, California.

134. Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.   Surveillance units positioned around the 781-address observed a white Chevrolet Suburban bearing California plate #7ELV122, registered to FAUSTO at 428 Jansu Place, Pomona, California parked in the driveway of the residence.

b.   Upon arrival to the 781- address, CI-4 called V. SANCHEZ to let him know that he/she was there.  V. SANCHEZ told CI-4 that someone would be out shortly.  Minutes later, FAUSTO exited from the residence and approached the CI's vehicle and placed the bag of M30 pills on CI-4's front passenger seat as the CI paid FAUSTO.  Once the deal was completed, FAUSTO reentered the residence while CI-4 drove away.

135. The CI drove to the pre-determined meeting location, where ATF SAs recovered 98.98 grams of a mixture and substance containing a detectable amount of fentanyl.

### HH.  MARCH 19, 2025: LAW ENFORCEMENT EXECUTES A SEARCH WARRANT AT ORNELAS' RESIDENCE AND RECOVERS ONE FIREARM, COCAINE, AND ECSTASY

136. On March 19, 2025, law enforcement served a search warrant at ORNELAS's residence, a two-bedroom apartment located on Haven Avenue in Rancho Cucamonga, California.  In serving this search warrant, at approximately 4 a.m., law enforcement surrounded the residence and called out to the residents.  After an approximate 10-minute delay, ORNELAS, ORNELAS's girlfriend, and ORNELAS's sister exited the residence.  ORNELAS's girlfriend and sister identified ORNELAS's bedroom that he shared with his girlfriend.

137. Upon searching ORNELAS and his girlfriend's bedroom, law enforcement located in a dresser drawer of this bedroom, on top of men's clothing that appeared to fit ORNELAS, one Glock, model 17, 9mm caliber handgun bearing serial number BFMW447 that had an extended 17-round magazine containing 16 9mm rounds and one .380 round of ammunition, and in an adjacent drawer, amongst more, similar male clothing that appeared to belong to ORNELAS, law enforcement located a bag containing a crystalline substance, and a white substance resembling cocaine.  The clothing in the dressers all appeared to be separated by male sized and styled clothing and female sized and styled clothing.

138. ORNELAS's girlfriend said no one outside of her, ORNELAS's sister, and ORNELAS lived in the apartment, and that

she shared the bedroom with ORNELAS.  Next to the toilet in a bathroom connected to ORNELAS's bedroom was a small plastic bag that was still wet.  The bag was similar to the two bags of narcotics that were located in the dresser drawer.  Based on my training and experience, and the circumstances of the delay between when law enforcement made their presence known and when ORNELAS finally exited the residence, couple with the fact that the small plastic bag was still wet and turned inside out at approximately 4 a.m. next to the toilet, with other baggies of suspected narcotics, I believe ORNELAS tried to quickly flush drugs down the toilet as officers were in the process of serving the search warrant.

139. Based on who was present and subsequent interviews, it appears that his girlfriend, and his sister also lived in the apartment.  No other men lived in the apartment to law enforcement's knowledge.  I asked ORNELAS's girlfriend about her knowledge of the gun and drugs found in her shared room with ORNELAS and she said she was unaware they were there.[24]

140. A DEA laboratory analysis of the crystalized substance showed a net weight of 6 grams of Methylenedioxymethamphetamine (MDMA).

---

[24] While back at the CPD station, as ORNELAS was in the process of being booked, I asked ORNELAS if he did drugs other than marijuana, to which he said he did not.  Additionally, I asked ORNELAS's girlfriend if she or ORNELAS did any drugs aside from marijuana, to which she said they did not.  Based, in part on this information, I believe that ORNELAS possessed the drugs with the intent to sell them.  Due to the wet plastic bag next to the toilet, I believe it is possible that ORNELAS possessed a larger quantity of drugs prior to the service of the warrant but ultimately destroyed a portion of it before being detained by officers.

141. A DEA laboratory analysis of the powdered substance showed a net weight of 11 grams of a mixture and substance containing a detectable amount of cocaine.

142. The drug amounts were subsequently confirmed by DEA laboratory testing.

## II.   APRIL 17, 2025: LOPEZ SOLD 1,000 FENTANYL PILLS TO AN ATF CONFIDENTIAL INFORMANT

143. Based on my review of social media messages, the following occurred:

a.   On April 14, 2025, LOPEZ posted an Instagram Story to his Instagram account advertising the sale of counterfeit M30 pills in a photograph depicting several clear plastic baggies containing blue pills.  CI-4 sent LOPEZ a direct message asking to purchase 1,000 M30 pills to which LOPEZ responded, "There's 2 kinds rn (right now) . . . . There is fire ones and alright ones."  The CI asked for the price of the "fire" ones, to which LOPEZ said they would cost $850.

b.   On April 17, 2025, LOPEZ told the CI to meet him at the "h mart . . . . In diamond bar."

144. I located an H Mart grocery shopping center at 2825 S. Diamond Bar Blvd, Diamond Bar, California, which was only approximately 1.2 miles from 21380 Chirping Sparrow Rd, Diamond Bar, California, a residence used by LOPEZ and his girlfriend, COVARRUBIAS.  Prior to the deal, surveillance units positioned themselves in the area of the 21380- residence and observed a black Tesla SUV bearing temporary California license plate #CM59X83.  I utilized law enforcement resources to verify the

registered owner of the vehicle.  The temporary license plate was assigned a permanent plate of #9LNY572, registered to Adrian Lopez at 1150 N. Willow Ave Apt #C5, Rialto, California.

145. Law enforcement observed LOPEZ exit his residence and approach the front end of the Tesla SUV where the trunk is located.  While appearing to carry and conceal something in his left hand, LOPEZ opened the trunk of the Tesla and leaned in, removing a compartment in the trunk and placing something inside.  LOPEZ then closed then trunk door before getting inside the driver seat.  LOPEZ was surveilled as he drove to the H Mart and met with CI-4 who was parked in the parking lot waiting.

146. Based on my conversations with the CI, and my review of the video/audio recording and law enforcement reports, the following occurred:

a.    Upon LOPEZ's arrival, the two spoke at the parked vehicles.  CI-4 paid LOPEZ and told him that he/she has customers who buy from him/her as LOPEZ gave the CI a bag containing the M30 pills.  LOPEZ responded by saying, "They're going to fuck with those ones," ensuring that they were high quality.  LOPEZ explained to the CI how to look at the different varieties of M30 pills and how to tell which ones were better quality than others.  LOPEZ explained to the CI that if he was to sell a bad batch of pills to his customers then they're not likely to come back if the quality is off.  LOPEZ ensured the pills he sold to the CI were good quality.

147. The CI drove to the pre-determined meeting location, where ATF SAs recovered 99.7 grams of a mixture and substance containing a detectable amount of fentanyl.

**JJ.  MAY 2, 2025: ESTRADA-FROST SHOOTS AT R.C.**

1.  <u>Summary of Evidence of the Puente-13 Street Gang's Involvement</u>

148. On May 2, 2025, at approximately 5:19 a.m., a shooting occurred outside of the H&H Liquor Store (the "liquor store") located at 736 Glendora Avenue, La Puente, California.  The shooting was captured on surveillance, which depicted ESTRADA-FROST, a member of the Puente-13 street gang, shoot at the victim's vehicle as the victim drove past ESTRADA-FROST.  The evidence supporting this determination includes, but is not limited to: (1) surveillance footage depicting Puente-13 members tagging "V P13 BS," which represents "Varrio Puente-13 Ballista Street," a reference to Puente-13's Ballista Street clique, (2) the same surveillance footage depicting ESTRADA-FROST's minor brother, A.E., hand a silver and black firearm to ESTRADA-FROST and ESTRADA-FROST then shooting the firearm towards the victim, (3) ESTRADA-FROST's own statements, namely, yelling "Fuck Nappz" and "Fuck Niggers" towards the victim before shooting at the victim, (4) forensic evidence, including: (i) a shell casing recovered from the scene of the shooting, (ii) a bullet fragment recovered from the victim's vehicle, and (iii) a loaded silver and black firearm recovered from A.E. on the same day as the shooting, matching the make and caliber of the shell casing recovered from the scene of the shooting, and (5) Instagram

93

pictures posted by ESTRADA-FROST to his social media account hours prior to the shooting, wearing the same clothing as seen in the surveillance video and holding a silver and black firearm matching the one used and recovered from the incident, and (5) cell-site location data showing L. SANCHEZ's cellphone in the area of the shooting at the time of the shooting.

      2.   <u>Description of the May 2, 2025, Shooting</u>

149. Based on my training and experience, review of law enforcement reports, conversations with other law enforcement agents, conversations with R.C., the victim in this case, and my review of surveillance footage, I am aware of the following:

      a.   On May 2, 2025, at approximately 5:18 a.m., a silver 2015 four-door Honda Accord bearing Arizona license plate number DJA6CV (the "Honda Accord") parked on the sidewalk next to the liquor store. Shortly after, three occupants exited from the Honda Accord.

      b.   Based on my review of surveillance footage and conversations with LASD personnel who are familiar with the Puente-13 criminal street gang, I recognized ESTRADA-FROST as he exited from the driver seat of the Honda Accord. A. E. exited the rear-driver side seat and handed what appeared to be a handgun to ESTRADA-FROST. The video also depicted an individual who I recognized to be a Puente-13 member, R.L., exit from the front passenger-side seat and an individual who I recognized to be L. SANCHEZ exit from the rear passenger side seat.

      c.   The surveillance footage depicted ESTRADA-FROST openly carrying a handgun while A.E. spray painted the liquor

store's exterior wall.  Based on my training and experience and review of the surveillance footage, it appeared as though ESTRADA-FROST was serving as an armed lookout while A. E. spray painted the liquor store's exterior wall.

d.     While A. E. spray-painted the wall, the victim was located across the street at a carwash vacuuming his vehicle.  ESTRADA-FROST then walked towards the victim and began yelling to him, "Fuck Nappz," which I know to be a commonly used derogatory term for Neighborhood Crip gang members.  ESTRADA-FROST then told the victim "This is Puente."  I know from this investigation and speaking with LASD officers, that the Puente-13 criminal street gang are rivals of the West Covina Neighborhood Crips.  The victim, who is not gang-affiliated, saw the group of males across the street as a male wearing a black and white hooded sweatshirt yelled at the victim.  The surveillance footage showed ESTRADA-FROST wearing a black and white hooded sweatshirt.

e.     The victim then moved towards his own vehicle to leave the area.  Before the victim entered his vehicle, ESTRADA-FROST yelled "Fuck Niggers" to the victim multiple times.  Fearing for his safety as the group of males began to approach, the victim entered his vehicle to leave the area.

f.     Based on my review of the surveillance footage, as the victim's vehicle drove past ESTRADA-FROST, ESTRADA-FROST shot at the victim's vehicle.  The round struck the upper part of the passenger door frame.  A. E. then continued spray

95

painting the liquor store's wall, before the group entered the Honda Accord and drove away from the area.

g.   I have included a still of the surveillance video below:



h.   After leaving the area, the victim notified law enforcement about the shooting.  Law enforcement responded and took photographs of the spray-painted liquor store wall, which read "V P13 BS."  The "S" appeared only partially finished. Based on my training and experience, I believe the graffiti reads as "V" = "Varrio," "P13" = "Puente-13," and "BS" if finished, would read "BST" which stands for "Ballista Street" which is a Puente-13 clique.  Based on my training and experience, review of social media accounts, and conversations with other law enforcement officers, I believe ESTRADA-FROST, A. E., R. L., and L. SANCHEZ are members of Puente-13's Ballista Street clique.  I know that the area in which the incident occurred is within Puente-13 gang territory.  I believe that the

group was marking their territory by spray-painting their gang insignia and using firearms as intimidation for perceived rivals or black civilians.

        i.    Hours after the incident, LASD Detective Vaca reviewed an Instagram social media page with the username "isaacfrm.lp." I am familiar with this account, as I have routinely viewed it from undercover social media profiles and believe it is primarily operated by ESTRADA-FROST due to the number of pictures he is present in and the account's name. On May 1, 2025, at approximately 11 p.m., hours prior to the shooting, ESTRADA-FROST posted multiple pictures of him holding two different firearms. In those pictures, ESTRADA-FROST was wearing the same black colored sweatshirt with white flowers on it, black beanie, jeans, and black and white shoes that he was wearing in the surveillance footage of the shooting. One of the firearms, a handgun with a silver slide, appeared to be the same firearm that ESTRADA-FROST was holding in the surveillance footage, which also appeared to have a silver slide.

        j.    I have included one such photograph below:

97



        k.    Hours after the shooting, at approximately 5:15
p.m., LASD officers located the Honda Accord traveling in the La
Puente area.  Officers conducted a stop, at which point A.E.
fled from the vehicle on foot and was apprehended a short
distance away.  Officers recovered a firearm with a silver slide
and a live round in the chamber as well as six additional rounds
in the magazine, totaling seven rounds.  Given that the magazine
was capable of holding eight rounds, I believe one round was
missing or had been fired.  The handgun recovered from A.E.
appeared to be the same handgun ESTRADA-FROST used to shoot at
the victim.  A shell casing recovered from the scene of the
shooting matched the same make and caliber as the rounds loaded
in the recovered handgun.  Additionally, ESTRADA-FROST, L.
SANCHEZ, and R.L. were inside of the Honda Accord during the
traffic stop.

l.    I reviewed cell-site location data for a
cellphone used by L. SANCHEZ.  This phone was identified as
belonging to L. SANCHEZ following subscriber data and live
interceptions of V. SANCHEZ where L. SANCHEZ was captured
calling from this number.  The cell-site location data revealed
that L. SANCHEZ's cellphone was in and around the area of the
shooting at and around the time of the shooting, corroborating
the surveillance video that showed L. SANCHEZ being there.

**KK.  Felony Criminal Histories**

150. Based on my review of criminal history databases and
records, and my involvement in this investigation, I am aware
that the following individuals have been convicted of at least
one felony and, therefore, are prohibited from shipping,
transporting, possessing, and/or receiving firearms and
ammunition.  The felony convictions are as follows:

a.    *GORDIAN-PADILLA*

a.    On or about March 9, 2020, Carrying a Concealed
Weapon in a Vehicle, in violation of California Penal Code
Section 25400(A)(1), in West Covina Court, Case Number KA123759-
01.


b.    *FAUSTO*

b.    On or about April 2, 2009, Robbery, in violation
of California Penal Code Section 211, in Pomona Court, Case
Number POMKA08640502.

    *c. J. RODRIGUEZ*

  c. On or about January 23, 2006, Evading a Peace
Officer, in violation of California Vehicle Code Section
2800.2(A), in Los Angeles Central Court, Case Number
XCNBA29664301.

  d. On or about June 13, 2013, Felon in Possession of
a Firearm, in violation of California Penal Code Section
29800(A)(1), in West Covina Court, Case Number CITKA10221601.

    *d. V. SANCHEZ*

  a. On or about September 16, 2021, Possession for
Sale of a Controlled Substance, in violation of California
Health and Safety Section 11351, in Ontario Court, Case Number
FWV21002982.

**LL. Interstate Nexus of Firearms and Ammunition**

  151. Based on my involvement in this investigation, I am
aware that ATF Interstate Nexus Experts have examined the
firearms and ammunition referenced in this affidavit and,
excluding the ghost guns, that is, firearms bearing no
manufacturer's mark, confirmed that they were manufactured
outside of the State of California.  Because the firearms and
ammunition were found in California, I believe that they
traveled in and affected interstate and foreign commerce.

**MM. Identification of the SUBJECT PREMISES and Continued
   Criminal Activity at the SUBJECT PREMISES and by
   Persons to Be Searched**

  152. Based on my conversations with ATF CIs and law
enforcement officers familiar with Puente-13 and their
associates; my review of recorded conversations, cell-site

location data, GPS vehicle tracker data, social media, Apple iCloud data, and cellphone device extractions; physical surveillance that was conducted; previous search warrants that were executed; and my own knowledge of the investigation, I am aware of the following:

1. <u>V. SANCHEZ and L. SANCHEZ: SUBJECT PREMISES 1</u>

a.  I am aware that SUBJECT PREMISES 1 is V. SANCHEZ's and L. SANCHEZ's current residence based on the following information:

i.  On November 4, 2024, V. SANCHEZ instructed an ATF CI to go to SUBJECT PREMISES 1 to purchase a firearm. Surveillance units observed V. SANCHEZ's sister, M.S., exit SUBJECT PREMISES 1 and deliver the firearm to the CI.

ii.  On November 7, 2024, ATF and CHP served a search warrant at SUBJECT PREMISES 1 and located V. SANCHEZ and L. SANCHEZ inside, both of whom stated they lived at SUBJECT PREMISES 1.  A search of the residence showed clothing and other items that belonged to V. SANCHEZ and L. SANCHEZ in their respective bedrooms.  I recovered 13 rounds of 9mm ammunition from a toilet bowl adjacent to V. SANCHEZ's bedroom.  Based on my training and experience, this appeared to be an attempt to quickly discard the ammunition upon law enforcement's arrival. Tens of thousands of dollars' worth of suspected stolen products, suspected to have been stolen from cargo trains in the area that I have been investigating, were also recovered from inside SUBJECT PREMISES 1 and inside a vehicle.

101

iii. I have reviewed cell-site information for L. SANCHEZ's cellphone from approximately December 1, 2025, to December 12, 2025. This data indicates that L. SANCHEZ has spent most nights at SUBJECT PREMISES 1. Additionally, cell-site information obtained during the Title III wiretap of V. SANCHEZ's cellphone in or around August 2024 showed that V. SANCHEZ also spent most nights at SUBJECT PREMISES 1.

iv. Throughout this investigation, V. SANCHEZ and L. SANCHEZ participated in various sales of firearms and controlled substances to ATF CIs.

v. On November 4, 2025, ATF SA Olmos observed V. SANCHEZ exit from SUBJECT PREMISES 1. V. SANCHEZ sat in the front seat of a vehicle for a short time before driving away in the vehicle.

vi. Based on information provided to me by CI-4, who has viewed V. SANCHEZ's Instagram stories, V. SANCHEZ has continued advertising controlled substances on his Instagram account since October 2025.

2.    FAUSTO: SUBJECT PREMISES 2

a.    I am aware that SUBJECT PREMISES 2 is FAUSTO's current residence based on the following information:

i.    Throughout this investigation, FAUSTO participated in controlled purchases with ATF CIs where he sold approximately five firearms, methamphetamine, and fentanyl pills.

ii.    On August 2, 2023, FAUSTO and V. SANCHEZ sold two firearms to CI-1 inside of FAUSTO's residence that he

had stored within the location.  FAUSTO is believed to no longer reside at that residence.

iii. On September 4, 2025, I observed FAUSTO exit SUBJECT PREMISES 2 and enter a vehicle that was parked in the driveway.  Moments later, FAUSTO re-entered SUBJECT PREMISES 2.

iv.  On November 24, 2025, surveillance units observed FAUSTO enter and exit SUBJECT PREMISES 2.

v.  Since approximately November 20, 2025, through at least December 12, 2025, I have reviewed cell-site location data for FAUSTO's cellphone.  This data shows that his cellphone has been present at SUBJECT PREMISES 2 on a daily basis.  Additionally, the overnight location data consistently places FAUSTO's cellphone at SUBJECT PREMISES 2, indicating that FAUSTO has been sleeping there.

vi.  Based on information provided to me by a confidential informant (CI-6[25]), FAUSTO continues to sell firearms and controlled substances from SUBJECT PREMISES 2.  According to CI-6, FAUSTO coordinates the transportation of firearms from outside California and stores them at SUBJECT PREMISES 2 before selling them.

3.    LOPEZ: SUBJECT PREMISES 3

a.    I am aware that SUBJECT PREMISES 3 is a known Puente-13 gang residence where LOPEZ currently resides based on

---

[25] CI-6 has been an ATF CI since 2025.  CI-6 has received felony convictions for firearm, controlled substance, and evading a peace officer related offenses.  CI-6's information has been corroborated and found to be credible.

the following information:

      i.  I know from speaking with law enforcement in the area of SUBJECT PREMISES 3 that the residence is not just a house but is also used as a hangout location and stronghold for Puente-13 gang members.  Local law enforcement officers have responded to numerous calls for service at the residence and have located numerous known Puente-13 gang members at the location.

      ii.  I have reviewed local records that indicate multiple Puente-13 members have used SUBJECT PREMISES 3 as their place of residence.

      iii. From an undercover Instagram account, since the beginning of this investigation in approximately March 2023 to December 2025, I have observed multiple known Puente-13 gang members, including LOPEZ, post photographs and videos at SUBJECT PREMISES 3, including pictures and videos of guns on their Instagram account while at SUBJECT PREMISES 3.  On December 11, 2025, I observed a photograph of SUBJECT PREMISES 3's backyard posted on LOPEZ's Instagram account, which I recognized based on having previously assisted in the execution of a search warrant at SUBJECT PREMISES 3.

      iv.  I have spoken with CI-6 who stated that SUBJECT PREMISES 3 is used as a gang hangout location where Puente-13 members often have parties, gatherings, and meetings. CI-6 said told me, based on their visits to the location, guns and drugs are often present.

      v.  I have conducted numerous surveillance

operations between January 2025 and November 2025 at SUBJECT
PREMISES 3 and have observed multiple known Puente-13 gang
members, including LOPEZ, coming and going from the location.

vi.   During the Title-III wiretap of LOPEZ's
cellphone in this investigation, LOPEZ spoke almost daily with
his uncle, A.L., who lives at SUBJECT PREMISES 3.  The two
frequently discussed the sale of M30 fentanyl pills directly
from SUBJECT PREMISES 3 and how to attract more customers.
LOPEZ advised A.L. when customers were coming by SUBJECT
PREMISES 3 and how many pills A.L. was to sell them.

vii. In recorded calls between LOPEZ and
COVARRUBIAS, LOPEZ explained that ESTRADA-FROST was selling a
large quantity of M30 pills on his own from the garage portion
of SUBJECT PREMISES 3, effectively taking customers away from
him and A.L.

viii.    On November 5, 2024, West Covina Police
Department and ATF served a search warrant at SUBJECT PREMISES
3.  Inside the residence were multiple known Puente-13 members
who were detained by law enforcement.  Inside SUBJECT PREMISES
3, officers recovered three loaded firearms, ammunition, two
sets of body armor, cocaine, fentanyl, and carfentanil.  The
drugs were broken down into smaller individual bags and
separated to be quickly sold and distributed.  The firearms were
located directly next to the drugs, which based on my training
and experience, I believe were used to protect the drug stash.

ix.  I have spoken with law enforcement officers
who have seen increased foot traffic activity at the residence

since the search warrant, consistent with the ongoing sale of
drugs at SUBJECT PREMISES 3.

   x. I have reviewed cell-site location data for
LOPEZ which has revealed frequent visits and overnight stays at
SUBJECT PREMISES 3.  Beginning no later than December 1, 2025,
to no earlier than December 12, 2025, LOPEZ's cell-site location
data has been consistent with LOPEZ staying overnight at SUBJECT
PREMISES 3.  Additionally, on December 4, 2025, surveillance
units observed LOPEZ exit SUBJECT PREMISES 3 and enter a vehicle
before leaving the residence.  Based on LOPEZ's cellphone being
present at SUBJECT PREMISES 3 overnight, I believe LOPEZ is
residing at SUBJECT PREMISES 3.  Additionally, based on the
intercepted calls, I believe LOPEZ is continuing to use SUBJECT
PREMISES 3 as his base of operations for the sale of drugs.

   xi. I spoke with CI-4 who said that he/she has
observed LOPEZ's Instagram Stories where LOPEZ has advertised
the sale of M30 fentanyl pills within the past two months
through social media.  I know from the controlled purchase
conducted on April 17, 2025, that LOPEZ offered fentanyl pills
for sale via Instagram and CI-4 purchased the drugs from him.

   xii. On December 12, 2025, CI-4 sent LOPEZ a
direct message through Instagram asking LOPEZ if he had a "jar"
for sale.  Based on my training, experience, and speaking with
CI-4, I know that "jar" is slang terminology for 100 M30
fentanyl pills.  LOPEZ responded to CI-4 with, "Yeah," and
provided CI-4 with a time when he could sell the fentanyl pills.

   xiii. Based on LOPEZ continuing to post to

social media regarding the advertisement of fentanyl pills and him staying at the residence known to law enforcement for the drug trafficking, I believe that LOPEZ is continuing to sell drugs from SUBJECT PREMISES 3.

        4.  <u>GORDIAN-PADILLA: SUBJECT PREMISES 4</u>

        b.  I am aware that SUBJECT PREMISES 4 is GORDIAN-PADILLA's current residence based on the following information:

        i.  Throughout this investigation, GORDIAN-PADILLA was involved in the sale of approximately seven firearms to ATF CIs.

        ii.  On October 15, 2025, West Covina Police Department officers conducted a traffic stop to a vehicle registered to GORDIAN-PADILLA.  Officers observed GORDIAN-PADILLA and two additional known Puente-13 gang members inside. During their investigation, officers recovered a firearm and narcotics paraphernalia inside the vehicle.

        iii. Since approximately November 20, 2025, through at least December 12, 2025, I reviewed cell-site location data indicating that GORDIAN-PADILLA's cellphone was routinely located in the immediate vicinity of SUBJECT PREMISES 4 on most days and nights.  In addition, surveillance units observed GORDIAN-PADILLA's vehicle parked in front of SUBJECT PREMISES 4, and GORDIAN-PADILLA's cellphone consistently showed overnight location data in the area of SUBJECT PREMISES 4. Based on this information, I believe that GORDIAN-PADILLA resides at SUBJECT PREMISES 4.

iv.   I have continued to observe GORDIAN-PADILLA advertising the sale of firearms through Instagram Stories, including as recently as approximately two months ago.  This conduct is consistent with the manner in which GORDIAN-PADILLA previously advertised firearms while confidential informants were conducting controlled purchases throughout the course of this investigation.

v.   On November 10, 2025, I observed a vehicle registered to GORDIAN-PADILLA parked in a carport adjacent to SUBJECT PREMISES 4.  A short time later, I observed GORDIAN-PADILLA exit from SUBJECT PREMISES 4 and enter the vehicle.

5.   <u>CARMONA: SUBJECT PREMISES 5</u>

a.   I am aware that SUBJECT PREMISES 5 is CARMONA's current residence based on the following information:

i.   Throughout this investigation, CARMONA was involved in the sale of firearms on two occasions.  Prior to each deal, CASTRO brokered the sale and directed an ATF CI to CARMONA's previous residence to purchase the firearms.  CARMONA sold a total of nine firearms, including one equipped with a machinegun conversion device installed.

ii.   Surveillance units observed CARMONA and CASTRO enter CARMONA's previous residence during each deal and exit with the firearms that were retrieved from inside.

iii. On September 7, 2023, CPD and ATF served a search warrant at CARMONA's previous residence and located approximately seven firearms, one of which contained an

obliterated serial number, thousands of rounds of ammunition, and body armor.

iv.  I spoke with CARMONA following the September 7, 2023 warrant execution, and he told me that he customizes firearms for the cartels in Mexico and routinely makes trips to Mexico to conduct business.  CARMONA said he routinely has access to a large number of firearms and can sell them on the streets to people.

v.  I reviewed cell-site location data that indicated CARMONA took a trip to Mexico as recently as December 2, 2025.  The cell-site location data indicated CARMONA traveled across the United States-Mexico border into Mexico at a late hour and returned to the United States a few hours later.  I know, based on my training and experience, traffickers do not spend much time across the border when delivering or picking up contraband.  I believe, based on my previous discussions with CARMONA and his recent activity, that CARMONA is continuing to participate in firearms trafficking.

vi.  Since approximately November 20, 2025, through at least December 12, 2025, I have reviewed cell-site location data for CARMONA's phone.  This data shows that his cellphone has been present at SUBJECT PREMISES 5 on a consistent basis.  Additionally, the overnight location data consistently places CARMONA's cellphone at SUBJECT PREMISES 5, indicating that he has been sleeping there.

6.    J. RODRIGUEZ and E. RODRIGUEZ: SUBJECT PREMISES 6

a.    I am aware that SUBJECT PREMISES 6 is J.
RODRIGUEZ and E. RODRIGUEZ's current residence based on the
following information:

i.    During the Title-III wiretap of V. SANCHEZ's
cellphone in this investigation, investigators intercepted
communications between V. SANCHEZ and J. RODRIGUEZ beginning no
later than August 24, 2024.  In these calls and text messages,
J. RODRIGUEZ and V. SANCHEZ discussed the availability and sale
of M30 fentanyl pills that J. RODRIGUEZ wanted to acquire.  The
phone number J. RODRIGUEZ used to contact V. SANCHEZ was
subscribed to E. RODRIGUEZ at SUBJECT PREMISES 6.

ii.    On September 2, 2024, J. RODRIGUEZ called V.
SANCHEZ and told him he had approximately 800 to 900 M30 pills
left and that they were "right there at the pad fool, they're
yours . . . .  Let me know when you're ready."

iii. J. RODRIGUEZ sent a text message to V.
SANCHEZ reading, "Just give me a time so I can set it up and
have that ready for you."  Minutes later, J. RODRIGUEZ sent V.
SANCHEZ the address to SUBJECT PREMISES 6.

iv.    Later that evening, surveillance units
observed V. SANCHEZ arrive to the area of SUBJECT PREMISES 6 and
called J. RODRIGUEZ to tell him to let E. RODRIGUEZ know he had
arrived.  J. RODRIGUEZ acknowledged and told V. SANCHEZ to go to
the door of SUBJECT PREMISES 6 and meet with E. RODRIGUEZ.  A
short time later, V. SANCHEZ left the residence, got inside his
vehicle and drove away.

v.   After leaving the residence, investigators
intercepted communications between J. RODRIGUEZ and V. SANCHEZ
discussing the quality of the M30 pills that V. SANCHEZ just
picked up from E. RODRIGUEZ at SUBJECT PREMISES 6.

vi.  On September 18, 2024, the San Bernardino
Police Department and ATF served a search warrant at SUBJECT
PREMISES 6.  During the service of the warrant, E. RODRIGUEZ
said J. RODRIGUEZ was out of town for work.

vii. Inside SUBJECT PREMISES 6, officers located
a stolen, loaded handgun on the bedroom nightstand directly
beside approximately 2,000 M30 fentanyl pills, a bag of cocaine,
a digital scale, and small plastic baggies used to package the
drugs.  Inside the adjacent closet, officers recovered a loaded
shotgun.

viii.    I spoke with E. RODRIGUEZ who said she
recently picked up the seized M30 pills from LOPEZ.  E.
RODRIGUEZ said J. RODRIGUEZ would go away on work periodically
and that J. RODRIGUEZ would facilitate a deal and have E.
RODRIGUEZ separate the drugs, bag them in their respective
amounts, and sell them from the house, oftentimes from the front
door.

ix.  On October 31, 2025, surveillance units
observed multiple people going to the door of SUBJECT PREMISES
6, meeting with someone inside, and leaving a short time later,
consistent with E. RODRIGUEZ's description of how drug
transactions occurred at SUBJECT PREMISES 6.

x.    On November 7, 2025, surveillance units observed J. RODRIGUEZ exit SUBJECT PREMISES 6 and enter his vehicle before leaving the area.

xi.   Since approximately November 20, 2025, through at least December 12, 2025, I have reviewed cell-site location data for cellphones belonging to J. RODRIGUEZ and E. RODRIGUEZ.  This data shows that both cellphones have been present at SUBJECT PREMISES 6 on a consistent basis. Additionally, the overnight location data consistently places both cellphones at SUBJECT PREMISES 6, indicating that they have been sleeping there.

## VI. TRAINING AND EXPERIENCE ON DRUG TRAFFICKING OFFENSES

153. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct drug trafficking investigations, I am aware of the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the acquisition and distribution of illegal drugs.  The aforementioned records are often maintained where drug

112

traffickers have ready access to them, such as on their cell
phones and other digital devices, and in their residences.

c.    Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to
have photos and videos on their cell phones of drugs they or
others working with them possess, as they frequently send these
photos to each other and others to boast about the drugs or
facilitate drug sales.

d.    Drug traffickers often keep the names, addresses,
and telephone numbers of their drug trafficking associates on
their digital devices and in their residence.  Drug traffickers
often keep records of meetings with associates, customers, and
suppliers on their digital devices and in their residence,
including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport
their narcotics and may keep stashes of narcotics in their
vehicles in the event of an unexpected opportunity to sell
narcotics arises.

f.    Drug traffickers often maintain on hand large
amounts of United States currency in order to maintain and
finance their ongoing drug trafficking businesses, which operate

113

on a cash basis.  Such currency is often stored in their
residences and vehicles.

      g.  Drug traffickers often keep drugs in places where
they have ready access and control, such as at their residence
or in safes.  They also often keep other items related to their
drug trafficking activities at their residence, such as digital
scales, packaging materials, and proceeds of drug trafficking.
These items are often small enough to be easily hidden and thus
may be kept at a drug trafficker's residence even if the drug
trafficker lives with others who may be unaware of his criminal
activity.

      h.  It is common for drug traffickers to own multiple
phones of varying sophistication and cost as a method to
diversify communications between various customers and
suppliers.  These phones range from sophisticated smart phones
using digital communications applications such as social media
messengers and the like, to cheap, simple, and often prepaid
flip phones, known colloquially as "drop phones," for actual
voice communications.

### VII. <u>**TRAINING AND EXPERIENCE ON FIREARM OFFENSES**</u>

154. From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

      a.  Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in

places that are readily accessible, and under their physical control, such as in their digital devices, vehicles, and residences.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful purchase of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently

send these photos to each other to boast of their firearms
possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices.

## VIII.      <u>TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES</u>

    155. Based on my training and experience, as well as my
familiarity with investigations conducted by other law
enforcement officers into racketeering enterprises, including
those engaged in murder (and similar acts of violence), drug and
firearm trafficking, money laundering, fraud, and other
racketeering activity conducted by criminal enterprises
("Racketeering Activity"), I am aware of the following:

        a.    Racketeering Activity involves numerous
participants operating in either a "flat" or hierarchical
structure.

        b.    Criminal enterprises may sell narcotics, create
illegitimate businesses, launder the proceeds of their illicit
activities, commit theft, commit acts of violence, and engage in
other criminal conduct, like fraud.

        c.    Criminal enterprise members and associates will
often take and share photographs and videos of their illicit
activities using their digital devices.

        d.    Criminal enterprise members and associates often
maintain books, receipts, notes, ledgers, bank records, and
other records relating to their Racketeering Activity.  Such
records are often maintained where the criminal enterprise

116

member has ready access to them, such as in their homes, their places of business, in their vehicles, on their persons, and in their cellphones and other digital devices. Additionally, I am aware that individuals engaged in racketeering enterprises often keep such evidence for long periods of time, including in storage on their digital devices that they keep in close proximity, for extended periods of time, including in their homes, their places of business, and on their persons.

e.    Communications between enterprise participants, as well as from victims of Racketeering Activity, often take place by telephone calls and messages, such as e-mail, text messages, the exchange of photographs and videos, and social media messaging applications, sent to and from cellphones and other digital devices.

f.    Criminal enterprise members and associates often keep the names, addresses, and telephone numbers of those involved in their Racketeering Activity on their digital devices and in their vehicles and residences. Criminal enterprise members and associates often keep records of meetings with others engaged in illicit criminal activity, including in the form of notes, calendar entries, and location data.

g.    Criminal enterprise members and associates often possess firearms to protect and advance their Racketeering Activity. Criminal enterprise members and associates often keep information regarding their firearms on their digital devices, including contacts that can provide firearms and photographs of firearms they possess and use.

117

## IX. <u>TRAINING AND EXPERIENCE ON KIDNAPPING AND OTHER VIOLENT OFFENSES</u>

156. Based on my training and experience, and the training and experience of other agents with greater involvement in kidnapping and violent crime investigations, I am aware of the following:

a.    Individuals who commit kidnapping and other violent crimes, including shootings, or seek the assistance of others in committing such crimes or concealing the evidence of such crimes often maintain materials about their criminal partners and intended victims in their residences, in their vehicles, on their persons, and on their digital devices, and often for long periods of time.  This information could include information about or photographs of their intended victims, their home addresses, information about places they frequent, or the motive behind such intended violent crime.  It could also include information about the victims' family members, communication with or from the victims' friends or family, or other information that could be used to carry out or conceal the violent crime.

b.    It is also common for individuals who have committed a kidnapping or other violent crime, or attempted to do so, to search social media or the internet using their digital devices to determine what investigators, news sources, or social media users know and/or are disseminating about the facts of the crime.  Individuals who commit violent crimes will often do so in an attempt to determine what potential evidence

may be used against them, to determine whether or not they are suspected of committing the crime, and if and how the suspect can formulate a plausible alibi or explanation for the involvement with the victim.

## X. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[26]

157. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[26] As used herein, the term "digital device" includes the SUBJECT DEVICES as well as any other electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

120

158. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

159. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress VICTOR SANCHEZ, ISAIAH CASTRO, LUCKY
SANCHEZ, ADRIAN LOPEZ, DOMINIC ORNELAS, ISAAC ESTRADA-FROST,
BRYAN GORDIAN-PADILLA, OTAN MOTAMEDI, and FERNANDO CARMONA's
thumb and/or fingers on the device(s); and (2) hold the
device(s) in front of VICTOR SANCHEZ, ISAIAH CASTRO, LUCKY
SANCHEZ, ADRIAN LOPEZ, DOMINIC ORNELAS, ISAAC ESTRADA-FROST,
BRYAN GORDIAN-PADILLA, OTAN MOTAMEDI, and FERNANDO CARMONA's

face with his or her eyes open to activate the facial-, iris-,
and/or retina-recognition feature.

160. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## XI. <u>REQUEST FOR NIGHT SERVICE</u>

161. I further request that the Court authorize
investigators to serve these warrants during the nighttime, as
set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  As noted
above, multiple targets are suspected of illegally possessing
firearms and engaging in violent acts, such as assaults and
kidnapping.  As a result, law enforcement currently plans to use
multiple Special Response Team (SRT) and Special Weapons and
Tactics (SWAT) teams to make entry and secure the SUBJECT
PREMISES at or around 4:00 a.m. on December 17, 2025.  The
government, however, is seeking night service for all the
warrants so that the searches may begin at the same time.  Based
on my training and experience, when warrants are being executed
in connection with violent gangs and where firearms are expected
to be present, it is critical to execute such warrants under the
cover of darkness and at the safest time, before dawn.  Given
the nature of the investigation and aggravating factors
involved, I believe that nighttime service is warranted in this
case.

## XII. <u>CONCLUSION</u>

162. For all of the reasons described above, there is
probable cause to believe the following:

a.    V. SANCHEZ violated 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (April 5, 2023);

b.    CASTRO and DOMINGUEZ violated 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (December 6, 2023);

c.    L. SANCHEZ and F. RODRIGUEZ violated 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (January 11, 2024);

d.    FAUSTO violated 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii): Distribution of Methamphetamine (August 23, 2023);

e.    LOPEZ, CASTILLO, COVARRUBIAS, and JOHNSON violated 18 U.S.C. § 1201(c): Conspiracy to Commit Kidnapping (July 19-20, 2023);

f.    ORNELAS violated 21 U.S.C. § 841(a)(1), (b)(1)(C): Possession with Intent to Distribute Controlled Substance and 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime (March 19, 2025);

g.    ESTRADA-FROST violated 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi): Possession with Intent to Distribute Fentanyl Analogue and 18 U.S.C. § 924(c)(1)(A)(i): Possession of a Firearm in Furtherance of a Drug Trafficking Crime (November 5, 2024);

h.    GORDIAN-PADILLA violated 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm (February 28, 2024);

124

      i.    MOTAMEDI violated 21 U.S.C. § 841(a)(1),
(b)(1)(A)(vi): Distribution of Fentanyl Analogue (September 16,
2024);

      j.    CARMONA violated 18 U.S.C. § 922(o)(1):
Possession of Machinegun (June 28, 2023);

      k.    J. RODRIGUEZ and E. RODRIGUEZ violated 21 U.S.C.
§ 841(a)(1), (b)(1)(B)(vi): Possession with Intent to Distribute
Fentanyl and 18 U.S.C. § 924(c)(1)(A)(i): Possession of a
Firearm in Furtherance of a Drug Trafficking Crime (September
18, 2024);

      l.    KANG violated 21 U.S.C. § 841(a)(1), (b)(1)(C):
Distribution of Cocaine (June 28, 2023); and

      m.    MEJIA and PONCE violated 26 U.S.C. § 5861(d):
Possession of Unregistered Short-Barreled Rifle (June 13, 2023).

163. Further, there is probable cause to believe that the
items listed in:

      a.    Attachment B-1, which constitute evidence,
fruits, and instrumentalities of violations of the V. SANCHEZ
Subject Offenses will be found at, in, or on V. SANCHEZ, as
described in Attachments A-1.

      b.    Attachment B-2, which constitute evidence,
fruits, and instrumentalities of violations of the CASTRO
Subject Offenses will be found at, in, or on CASTRO, as
described in Attachments A-2.

      c.    Attachment B-3, which constitute evidence,
fruits, and instrumentalities of violations of the L. SANCHEZ

Subject Offenses will be found at, in, or on L. SANCHEZ and SUBJECT PREMISES 1, as described in Attachments A-3 and A-4.

d.   Attachment B-4, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT PREMISES 2 Subject Offenses will be found at, in, or on SUBJECT PREMISES 2, as described in Attachment A-5.

e.   Attachment B-5, which constitute evidence, fruits, and instrumentalities of violations of the LOPEZ Subject Offenses will be found at, in, or on LOPEZ and SUBJECT PREMISES 3, as described in Attachments A-6 and A-7.

f.   Attachment B-6, which constitute evidence, fruits, and instrumentalities of violations of the ORNELAS Subject Offenses will be found at, in, or on ORNELAS, as described in Attachments A-8.

g.   Attachment B-7, which constitute evidence, fruits, and instrumentalities of violations of the ESTRADA-FROST Subject Offenses will be found at, in, or on ESTRADA-FROST, as described in Attachments A-9.

h.   Attachment B-8, which constitute evidence, fruits, and instrumentalities of violations of the GORDIAN-PADILLA Subject Offenses will be found at, in, or on GORDIAN-PADILLA and SUBJECT PREMISES 4, as described in Attachments A-10 and A-11.

i.   Attachment B-9, which constitute evidence, fruits, and instrumentalities of violations of the MOTAMEDI Subject Offenses will be found at, in, or on MOTAMEDI, as described in Attachments A-12.

j.    Attachment B-10, which constitute evidence, fruits, and instrumentalities of violations of the CARMONA Subject Offenses will be found at, in, or on CARMONA and SUBJECT PREMISES 5, as described in Attachments A-13 and A-14.

k.    Attachment B-11, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT PREMISES 6 Subject Offenses will be found at, in, or on SUBJECT PREMISES 6, as described in Attachments A-15.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  15th day of
December, 2025.

_____
HON. PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE

127